**REPRODUCTIVE HEALTH SERVICES, et al., Plaintiffs,**

v.

**William L. WEBSTER, et al., Defendants.**

No. 86–4478–CV–C–5.

United States District Court, W.D. Missouri, C.D.

March 17, 1987.

As Amended April 30, 1987.

Final Judgment on Consent June 23, 1987.

Frank Susman, Thomas M. Blumenthal, Susman, Schermer, Rimmel & Parker, St. Louis, Mo., Roger K. Evans, Planned Parenthood Federation of America, New York City, for plaintiffs.

Michael Boicourt, Jerry E. Short, William L. Webster, Office of Atty. Gen., Jefferson City, Mo., for defendants.

Andrew F. Puzder, St. Louis, Mo., for amicus curiae.

### ORDER

SCOTT O. WRIGHT, Chief Judge.

This is a class action for declaratory and injunctive relief in which plaintiffs challenge the constitutionality of several sections of the 1986 Missouri act relating to the regulation of abortions ("the Act").[1] This Court has jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331 and § 1343(3).

The named plaintiffs include Reproductive Health Services, a not-for-profit Missouri corporation operating an outpatient clinic in St. Louis, Missouri, which offers gynecological medical services to the public, including abortion services up to 22 weeks "gestational age."[2] Planned Parenthood of Kansas City is a not-for-profit Missouri corporation which provides pregnancy-related counseling and services, including abortions up to 14 weeks gestational age.

Plaintiff physicians are Howard I. Schwartz, M.D., Robert L. Blake, Jr., M.D., and Carl C. Pearman, M.D. These physicians are licensed to practice medicine in the State of Missouri and are associated with the University of Missouri Schools of Medicine, public facilities as defined in § 1(2) of the Act.[3] As such, they are "public employees" as defined in § 1(1), and are paid for the services they render by "public funds" as defined by § 1(3) of the Act. In the scope of that employment, these plaintiffs are consulted by pregnant female patients and, where medically indicated, have occasion to encourage or counsel such women to terminate their pregnancies. As part of their medical practice, Drs. Schwartz and Pearman also perform or assist with abortions, although not necessary to actually save their patients' lives.

Plaintiffs Carroll Metzger, R.N.C., C.M.A., and Mary L. Pemberton, B.S.W., are other health care providers, a registered nurse and social worker, respectively. Both are licensed in Missouri and employed at Truman Medical Center in Kansas City, Missouri, a "public facility." Both are "public employees" who, within the capacity of their employment, occasionally encourage or counsel certain patients to have abortions, even though the pregnancy is not life-threatening. Their services are paid for by "public funds."

These named plaintiffs bring this case on their own behalf and also as representatives of the entire class consisting of facilities, Missouri licensed physicians, or other health care professionals offering abortion counseling and services, and pregnant females.

Defendant William L. Webster is Attorney General of the State of Missouri. The State of Missouri has waived its 11th Amendment immunity from suit in federal court for this action only.

The Act was passed by the Missouri General Assembly on April 23, 1986, signed into law by Governor Ashcroft on June 26, 1986, and was to become effective on August 13, 1986. This action was filed on July 14, 1986. On July 31, 1986, this Court temporarily restrained enforcement of §§ 1.205.1(1), 188.025, 188.029, 188.039, 2, 3, and 4 of the Act. A full trial on the merits was heard on December 15–18, 1986.

### I. Class Certification

Prior to trial, the Court certified the plaintiff class pursuant to Rule 23 of the Federal Rules of Civil Procedure, after con-

---

**1.** Missouri Senate Committee Substitute for House Bill No. 1596, 83rd General assembly, 2nd Reg.Sess. (1986).

**2.** The term "gestational age" as used in this opinion and defined by Mo.Rev.Stat. § 188.015(4) refers to the length of pregnancy as measured from the first day of the woman's last menstrual period (LMP). This is approximately 2 weeks greater than fetal age.

The L.M.P. concept results in a 40-week gestational period. The trimester system by L.M.P. would be divided as follows:
1st trimester—0–13⅓ weeks;
2nd trimester—13⅓–26⅔ weeks;
3rd trimester—26⅔–40 weeks.

**3.** § 1 of the Act is codified at Mo.Rev.Stat. § 188.200.

cluding that all prerequisites set forth in Rule 23(a) had been met.[4]

▪ In evaluating whether the numerosity requirement is met, the Court considers the number of persons in a proposed class, the nature of the action and the inconvenience of trying individual suits. The Court finds that the number of health care providers, facilities and pregnant females in the State is sufficiently numerous. No arbitrary rules regarding the necessary size of classes have been established. *Paxton v. Union Nat. Bank,* 688 F.2d 552, 559 (8th Cir.1982).

The commonality requisite set forth in Rule 23(a) does not demand that every question of law or fact be common to every member of the class. *Id.* at 561. Rather, the issues are sufficiently common "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Id.*

▪ Similarly, the claims of the representative parties are typical of those of the class if they emanate from the same legal theory, remedial theory or offense" as those they represent. *U.S. Fidelity & Guaranty v. Lord,* 585 F.2d 860, 870 (8th Cir.1978). Here, the necessary commonality and typicality exist where the statute would prohibit or mandate certain actions of all health professionals who are public employees dealing with pregnant women. Additionally, all women seeking abortions after a specified gestational period would be confronted with other provisions of the Act.

▪ The fourth component of Rule 23(a) focuses on whether the class representatives have common interests with the class members and would vigorously prosecute the interests of the class through qualified counsel. *Paxton,* 688 F.2d at 562–63. Here, there are no apparent conflicts with the interests of the named plaintiffs and the rest of the class. Plaintiffs' counsel is

well-established in this genre of litigation. However, in opposing class certification, the defendant contends that the failure to name as plaintiff a pregnant female seeking abortion services or counseling renders the proposed class description broader than the named plaintiffs' interest. This argument must fail. It is clear that a plaintiff physician has standing to assert the rights of his/her patients, including those seeking abortions. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976).

▪ Further, this is the type of case appropriate for a 23(b)(2) class since the defendant has acted on grounds generally applicable to all members of the class and final injunctive and declaratory relief would be the appropriate remedy.[5] In cases which involve sensitive and highly personal matters, the reasons for certification become more substantial. A class action not only assures anonymity and prevents the chilling effect associated with public exposure concerning abortions, but also provides a fluid membership which guarantees a case or controversy. *Singleton,* 428 U.S. at 117, 96 S.Ct. at 2875.

▪ The Court disagrees with the defendant's argument that class certification should be denied where the only relief sought is declaratory and injunctive in nature and would automatically inure to the benefit of those similarly situated with the plaintiff. There is no language in Rule 23(b)(2), as there is in Rule 23(b)(3), that requires the Court to consider the *necessity* for a class action. Rule 23(b)(2) was specifically designed to allow for the class action mechanism in civil rights cases. *See* Advisory Committee's Note to 1966 Amendment to Rule 23, 39 F.R.D. 98, 102 (1966). Accordingly, the requirements of the rule are given a liberal construction in civil rights suits. *Coley v. Clinton,* 635 F.2d 1364, 1378 (8th Cir.1980). If the requirements of Rule 23(a) are met, a district court's discretion to deny certification on the basis of Rule 23(b)(2) is limited.

---

4. Rule 23(a) sets out the prerequisites to a class action:

 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

5. Rule 23(b)(2) provides:

 An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

■ While a district court generally should hold an evidentiary hearing before certifying a class, this is not mandatory where the Court has sufficient material before it to determine the nature of the allegations and whether the requirements of Rule 23(a) have been met. *See Walker v. World Tire Corp., Inc.*, 563 F.2d 918, 921 (8th Cir.1977). Here, in the interest of judicial economy and considering the nature of the case, the Court determined that the class certification was proper on the basis of pleadings, affidavits and the law.

## II. § 1.205 When Human Life Begins

Section 1.205.1 provides in part:

(1) The life of each human being begins at conception;

(2) Unborn children have protectable interests in life, health, and well-being.

■ Prior to trial, the Court granted plaintiff's motion in limine to exclude any evidence relating to this provision. In *Roe v. Wade*, 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973), the United States Supreme Court declared that a state may not adopt one theory of when life begins to justify abortion regulation. The general principles laid down in *Roe*, reaffirmed in *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), and *Thornburgh v. American College of Obstetricians*, — U.S. —, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), remain true today. It is inappropriate for this Court to conduct an inquiry into such a difficult and philosophical question:

> "When those trained in the respective disciplines of medicine, philosophy and theology are unable to arrive at any consensus [when life begins] the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer."

*Roe*, 410 U.S. at 158, 93 S.Ct. at 729. Similarly, "the word 'person', as used in the Fourteenth Amendment does not include the unborn." *Id.*

This legislative pronouncement by the Missouri General Assembly clearly conflicts with the essence of *Roe v. Wade.* Consequently, §§ 1.205.1(1) and (2) are invalid as a matter of law.

6. Mo.Rev.Stat. § 188.039 provides:

> **188.039. Consent, form, content—coercion prohibited—woman to be informed of certain facts, when**
>
> 1. No physician shall perform an abortion unless, prior to such abortion, the physician

## III. Summary Judgment

Prior to trial, the plaintiffs moved for summary judgment, urging that Mo.Rev. Stat. §§ 188.025, 188.029, 188.039, 2, 3, and 4 be declared unconstitutional as a matter of law. The standard for determining the propriety of summary judgment under Rule 56(a) is well-settled. Summary judgment should be entered only when it is clear that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The Supreme Court has recently acknowledged the power of district courts to enter summary judgments *sua sponte. Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

In making this determination, the evidence submitted to the Court "must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.1984). Moreover, the moving party must demonstrate its right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances. *Keys v. Lutheran Family and Children's Services of Missouri*, 668 F.2d 356 (8th Cir.1981). "[E]ven if the district court 'is convinced that the moving party is entitled to [summary] judgment, the exercise of sound judicial discretion may dictate that the motion should be *denied*, and the case fully developed.'" *Franklin v. Lockhart*, 769 F.2d 509, 510 (8th Cir.1985), *quoting McLain v. Meier*, 612 F.2d 349, 356 (8th Cir.1979).

Employing the above standard, the Court indicated at the pretrial conference that Section 188.039.1 was facially unconstitutional as a matter of law, and that plaintiff's motion for summary judgment would be sustained on this section. However, the Court determined that a factual inquiry was necessary, thus precluding summary judgment on the constitutionality of §§ 188.025, 188.029, 2, 3, and 4.

## IV. § 188.039—"Informed Consent"

Mo.Rev.Stat. § 188.039 [6] requires that "the attending physician" certify in writing

> certifies in writing that the woman gave her informed consent, freely and without coercion, after the attending physician had informed her of the information contained in subsection 2 of this section and shall further certify in writing the pregnant woman's age based upon proof of age offered by her.

that he or she has apprised the pregnant woman of certain facts before an abortion can be performed. The required information includes a statement "whether she is or is not pregnant" according to the best medical judgment of that physician.

The constitutionality of the requirement that "the attending physician" impart the information was settled in *City of Akron*, 462 U.S. 416, 103 S.Ct. at 2501–2502. In *City of Akron*, the Supreme Court invalidated a similar provision, holding that there was no state interest in requiring that "the physician performing the abortion, or for that matter any physician, personally counsel the patient in the absence of a request." *Id.*, 462 U.S. at 448, 103 S.Ct. at 2502.

■ This Court is unaware of any limiting construction of this statute by Missouri courts. Hence, the Court cannot assume, as defendant suggests, that the Missouri General Assembly possesses a familiarity with hospital practices that renders the clear language of § 188.039 capable of a much broader interpretation.[7] The statute simply does not permit the attending physician to delegate to another qualified individual the responsibility to convey the information needed for informed consent. Thus, this provision is invalid as a matter of law.

Plaintiffs' remaining objection to Section 188.039 concerns the requirement that, prior to having an abortion performed, the woman must be informed "according to the best medical judgment of her attending physician *whether she is or is not pregnant.*"

2. In order to insure that the consent for an abortion is truly informed consent, no abortion shall be performed or induced upon a pregnant woman unless she has signed a consent form that shall be supplied by the state department of health, acknowledging that she has been informed by the attending physician of the following facts:
 (1) That according to the best medical judgment of her attending physician whether she is or is not pregnant;
 (2) The particular risks associated with the abortion technique to be used;
 (3) Alternatives to abortion shall be given by the attending physician.

This regulation also must be considered in light of *City of Akron*, in which the Supreme Court stated that

> "[T]he validity of an informed consent requirement rests on the State's interest in protecting the health of the pregnant woman.... (citation omitted) [T]hus the state legitimately may seek to ensure that it has been made 'in the light of all attendant circumstances—*psychological and emotional as well as physical—that might be relevant to the well-being of the patient.*'" (quoting *Colautti v. Franklin,* 439 U.S. 379, 394, 99 S.Ct. 675, 685 [58 L.Ed.2d 596] (1979).) This does not mean, however, that a State has unreviewable authority to decide what information a woman must be given before she chooses to have an abortion. It remains *primarily the responsibility of the physician to ensure that appropriate information is conveyed to his patient, depending on her particular circumstances.*" (Emphasis added). *City of Akron*, 462 U.S. at 443, 103 S.Ct. at 2499.

In *Planned Parenthood Association of Kansas City, Mo., Inc. v. Ashcroft,* 655 F.2d 848 (8th Cir.1981), the Eighth Circuit held that the predecessor to § 188.039 was unconstitutional. This former provision required as part of informed consent that a pregnant woman be told "[t]hat according to the best medical judgment of her attending physician *she is* pregnant." The *Ashcroft* court found that the statutory language mandating an affirmation of pregnancy effectively proscribed menstrual extractions, an early and safe abortion procedure normally performed prior to a positive

3. The physician may inform the women of any other material facts or opinions, or provide any explanation of the above information which, in the exercise of his best medical judgment, is reasonably necessary to allow the woman to give her informed consent to the proposed abortion, with full knowledge of its nature and consequences.

7. The Court also notes that there is no procedure to certify questions for prompt resolution to the Missouri Supreme Court. *See* MO. CONSTITUTION. art. v. (Missouri Supreme Court may exercise appellate jurisdiction only).

pregnancy test,[8] because it would be impossible to be certain that the woman is pregnant. Such prohibition was unconstitutional.

Defendants claim that the amended version cures the constitutional defect because it does not forbid menstrual extractions so long as the woman is informed of the physican's evaluation of whether she is or is not pregnant. In addition, the record reveals that pregnancy tests are now available which can accurately detect pregnancy as early as six days after implantation, or three days before the first missed menstrual period.[9] Hence, defendants also assert that advances in medical technology render the factual basis for the *Ashcroft* decision obsolete. The Court accepts this narrow interpretation of the *Ashcroft* holding and rejects plaintiff's counterargument that § 188.039 is essentially identical to the former statute and, thus, unconstitutional under principles of *res judicata.*

It is also clear that there are situations where the physician cannot, with certainty, determine whether or not a woman is pregnant.[10] The statute necessitates disclosure of the physicians "best medical judgment" of her pregnancy status. It is broad enough to encompass a diagnosis that the physician does not *know* whether a woman is pregnant.

However, this provision is constitutionally flawed in other respects. The statute mandates what the physician must present to each and every patient, regardless of the medical advisability of presenting such information in any particular case. While plaintiffs do not object as a *general matter* to telling a woman whether she is pregnant

or not, it is clear that some physicians believe that it is in the best health interest of many patients seeking abortions not to be told definite results of pregnancy tests.[11] These are women who suspect they are pregnant and choose to abort, but cannot emotionally deal with the specific issue of being pregnant. Some physicians, in the exercise of their best medical judgment, would choose to respect the woman's evaluation of her emotional status and not foist on her specific information which she does not wish to hear.

■ Physicians disagree on how to approach patients seeking abortions. The physician's or other health professional's personal philosophy on abortions will certainly influence that approach.[12] It is not the province of this Court to approve one view or another. This Court must uphold the principles enunciated in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and its progeny: that the right to privacy, the conception of personal liberty, encompasses a woman's right to terminate her pregnancy. From the testimony at trial, the Court concludes that the rule which, *without exception,* requires a physician to inform a patient of her pregnancy status constitutes an impermissible intrusion into the privacy of the doctor-patient relationship. The requirement deprives the woman seeking an abortion of the right to consult with her physician and rely on his discretion and professional judgment. *See Roe v. Wade,* 410 U.S. at 165, 93 S.Ct. at 733.

■ The Court finds that the portions of § 188.039 so declared as unconstitutional are not severable from the remainder of

**8.** The District Court in *Ashcroft* noted that there was no record of existing reliable tests at the very "early stage" of pregnancy. *Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 483 F.Supp. 679, 698, n. 37 (W.D.Mo.1980). Although the exact parameters of the "early stage" are unclear, the court implied the time to be approximately up to ten days after the menstrual period was due. *Id.,* at 697, n. 36.

**9.** Testimony of Dr. Daniel J. Martin; Robert A. Hatcher, M.D., et al., CONTRACEPTIVE TECHNOLOGY 1986–1987 2547 (1986).

**10.** A woman in the process of spontaneous abortion (miscarriage) may have a positive pregnancy test but the physician cannot determine whether or not the embryo has been expelled. Testimony of Dr. Robert Crist. Further, even the most current of the readily available pregnancy tests are not accurate until 6 days after

implantation. Testimony of Dr. Daniel Martin; Hatcher, CONTRACEPTIVE TECHNOLOGY 1986–87 at 257.

**11.** Testimony of Dr. Robert Crist. Dr. Daniel Martin testified to the contrary.

**12.** Plaintiffs' witnesses, Dr. Crist, Dr. Warren Hern, and Ms. Judith Widdicombe, R.N., are members of the National Abortion Federation, which seeks to "improve access to safe abortion services for women." Testimony of Dr. Hern. Defendants' witnesses, Dr. Daniel Martin and Dr. William Keenan, are members of Missouri Citizens for Life, an anti-abortion organization. Dr. Keenan also admitted that for the past two years he has been a signatory to an annual newspaper ad which laments the *Roe v. Wade* decision.

the statute. Because the term "attending physician" is repeated in every subsection, the entire statute must fall as a unit. The provisions are inextricably woven together such that the valid provisions standing alone are incomplete and do not accurately reflect the legislative intent. See Mo.Rev. Stat. § 1.140 (1978). Hence, the requirement to impart specific information is invalid on this ground, as well.

## V. § 188.025—Post-Sixteen-Week Abortions to be Performed Only in a Hospital

Section 188.025 provides that every abortion performed at or subsequent to the first sixteen weeks gestational age shall be performed in a hospital.[13] The standard for evaluating the constitutionality of laws which regulate the performance of abortions after the first trimester is well-settled. In *City of Akron*, 462 U.S. at 430–31, 103 S.Ct. at 2493, the Supreme Court held that a state regulation which significantly impacts on a woman's access to abortion prior to viability of the fetus,[14] will be upheld only "to the extent that the regulation reasonably relates to the preservation and protection of maternal health." *Id., quoting Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731.

Thus, this Court's first inquest focuses on whether or not § 188.025 "significantly impacts" on abortion rights. If so, then the "reasonableness" of the regulation must be resolved. However, the State may not "adopt abortion regulations that depart from accepted medical practice." *Id.* at 431, 103 S.Ct. at 2493. The health regulations imposed by the State must be "legitimately related to the objective the

state seeks to accomplish." *Id.* Further, the State must make a reasonable effort to limit the regulation to that specific time during and after the second trimester when the health interest will be furthered. *Id.* at 434, 103 S.Ct. at 2495. The State has the burden of proving a health-justification. *Id.* at 430, 103 S.Ct. 2492–93; *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 664 F.2d 687, 689 (8th Cir.1981).

In *City of Akron*, 462 U.S. 416, 103 S.Ct. 2481, and *Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, the Supreme Court held that a hospitalization requirement for all second-trimester abortions was unconstitutional because such a requirement "unreasonably infringes upon a woman's constitutional right to obtain an abortion." *City of Akron*, 462 U.S. at 439, 103 S.Ct. at 2497; *Ashcroft*, 462 U.S. at 482, 103 S.Ct. at 2520. However, the Court did not draw a bright line to indicate at what point in the second trimester a state may require that abortions be performed in a hospital setting. This determination will depend on the impact of the regulation and its reasonableness, that is, whether it departs from accepted medical practice.

A hospitalization requirement clearly "places a significant obstacle in the path of women seeking an abortion." *City of Akron*, 462 U.S. at 434, 103 S.Ct. at 2495. The *Akron* court determined that the increased cost[15] of hospitalization and the fact that second-trimester abortions were rarely performed in area hospitals combined to significantly limit a woman's ability to obtain an abortion. If forced to travel to find available facilities, a woman incurs not only financial expense, but also additional health risks. *Id.*

It is evident that hospitalization significantly increases the cost of an abortion.[16]

---

**13.** See *supra* note 2. The 16–week L.M.P. stage would correspond with approximately 14 weeks fetal age. As previously noted, by the L.M.P. method, the 2nd trimester includes the time from 13⅓ through 26⅔ weeks after the last menstrual period.

**14.** "Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." *Colautti v. Franklin*, 439 U.S. 379, 388, 99 S.Ct. 675, 682 (1979). *Accord* Mo.Rev. Stat. § 188.015(7) (Supp.1986).

**15.** In *City of Akron*, in-hospital abortion cost was cited as $850–900, compared to $350–400 for a dilation and evacuation (D & E) abortion performed in a clinic. *Id.* 462 U.S. at 435, 103 S.Ct. at 2495.

**16.** Dr. Crist testified that the cost of an abortion in a Missouri hospital, other than Truman Medical Center which maintains a specialized outpatient abortion service, is in excess of $2500 for a sixteen-week or greater abortion. This compares with $350–650 in an outpatient facility. The Court notes, however, that 97% of the hospital-based abortions were performed at Truman Medical Center in 1985.

Moreover, the availability of hospital services for abortions is limited in Missouri. In 1985, only 22% of all abortions at 16 weeks or greater were performed in hospital facilities.[17] Of these relatively few hospital-performed abortions, 97% took place at Truman Medical Center, a public hospital in Kansas City.[18] Thus, the Court finds that, as in *City of Akron*, the scarcity of hospital-based abortion facilities restricts access to abortion services, and would necessitate travel by many across the state, which may result in delay and increased health risks to the patient seeking abortion services.[19] There is no evidence that hospitals in other parts of the state would offer abortion services if the hospitalization requirement were implemented.[20]

Accordingly, the Court concludes that the increased financial burden and restricted availability of hospital-based[21] abortion services creates a substantial interference with and imposes a direct burden on a woman's decision to have an abortion.

Having concluded that § 188.025 significantly impacts on abortion rights, the State must show that the sixteen-week hospitalization requirement reasonably relates to the State's interest in maternal health. In order to meet this burden, the State must show that non-hospitalized abortions of 16 weeks or greater gestational age can reasonably be considered more dangerous than hospitalized abortion procedures at an identical stage of pregnancy.

In *City of Akron*, the Supreme Court was impressed by current standards of the medical profession which indicated that abortions could be "performed safely 'in a hospital-based or in a free-standing ambulatory surgical facility, or in an out-patient clinic meeting the criteria required for a free-standing surgical facility' until 18 weeks of pregnancy." *Id.* 462 U.S. at 437, 103 S.Ct. at 2496, *citing* American College of Obstetricians and Gynecologists (ACOG), Standards for Obstetric-Gynecologic Services 54 (5th ed. 1982). This data remains current.[22]

Plaintiff Reproductive Health Services (RHS), which currently provides abortion services up to 22 weeks gestational age, would rely on ACOG guidelines as a "free-standing ambulatory surgical facility." The Court rejects the State's contention that RHS must be classified as a doctor's office or outpatient clinic because it is not licensed under Missouri's "Ambulatory Surgical Center Licensing Law."[23] The

---

On the national level, Dr. Stanley K. Henshaw provided statistics from 1981 and 1982 comparing the cost of a sixteen-week or greater D & E procedure. In 1981, the average clinic cost for a D & E was $358–364. In 1982, the average hospital charge for the same procedure was $740.00.

Dr. Warren Hern also related that hospitalization "invariably" costs more. He estimated that, in the Boulder, Colorado area, the cost is $1000 greater for an abortion in the hospital than in an outpatient facility.

**17.** In 1984, 28% of such abortions were performed in the hospital setting.

**18.** In 1984, 98% of the hospital-based 16–week abortions were performed at Truman Medical Center.

**19.** Testimony of Dr. Crist; stipulation of facts.

**20.** On the contrary, Dr. Stanley Henshaw testified that a 1982 survey (prior to the *City of Akron* ruling) showed that 27% of hospitals performed abortions in those states with a hospitalization requirement for second-trimester abortions. In the states without mandatory hospitalization rule, 39% of hospitals provided second-trimester services.

Similarly, in Missouri, the number of second-trimester abortions increased from 540 in 1979 to 700 in 1980 after the prohibition on non-hospital second-trimester abortions was lifted. Significant also is the increase in the total number of second-trimester abortions performed in Missouri in 1980. The number rose from 540 in 1979 to 1390 in 1980. This indicates that the hospitalization requirement resulted in the performance of fewer procedures than if the requirement was not in effect. *See Planned Parenthood of Kansas City, Missouri, Inc. v. Ashcroft*, slip op. *on remand*, No. 79–4142–CV–C–H, slip op. at 8–10 and n. 12 (W.D.Mo. October 2, 1981), 664 F.2d 687, 689 n. 5 (8th Cir.1981).

**21.** Truman Medical Center, as a public facility, would be barred from providing *any* abortions not necessary to save the woman's life if Section 4 of the Act (§ 188.215) were to become effective. *See supra* note 18. If upheld, the effect of this hospitalization requirement in conjunction with the "public facility" rule would effectively eliminate access to abortions in Missouri past 16 weeks gestation.

**22.** *ACOG*, Standards for Obstetric-Gynecologic Services (6th ed. 1985).

**23.** Mo.Rev.Stat. § 197.200, *et seq.* the Missouri Ambulatory Surgical Center Licensing Law, was

ACOG standards are convincing evidence that as a general rule, D & E[24] abortions may be safely performed in free-standing surgical facilities, such as RHS, through 18 weeks of gestation.

 Additional evidence further demonstrates that the performance of abortions at qualified free-standing outpatient facilities does not necessarily render the procedure more dangerous than if performed in the hospital setting. It is undisputed that the primary factor in determining the safety of a D & E procedure at 16 weeks or greater is the skill and experience of the physician-operator.[25] There was also testimony that the most experienced physicians are more likely to be found practicing in high volume abortion facilities than in hospitals.[26]

Defendants failed to establish that the potential for uterine bleeding necessitates that abortions be performed in a hospital. This complication evidently is best controlled by contraction of the uterine musculature with drugs and vigorous uterine massage.[27] The data presented at trial suggests that it rarely becomes necessary to transfer the patient to a hospital for treatment.[28]

Nor was there proof that the incidence of infection is diminished when post-sixteen-week abortions are performed in the hospital rather than in a free-standing clinic. Infection, if it occurs, does not usually manifest itself until at least a few days after the procedure, by which time the patient will have been discharged from either a hospital or an outpatient facility.[29] Moreover, there was evidence that nosocomial infections, those acquired in a hospital setting, tend to be more resistant to antibiotic therapy.[30]

Plaintiffs have also cited the lack of specialized equipment, administrative delays, unsympathetic attitudes or inexperience of hospital personnel and the loss of patient confidentiality as factors which disfavor abortions in hospitals.[31] Plaintiffs empha-

---

only recently amended to cover abortion facilities. Regulations to implement these amendments have not yet been promulgated. Up to this time, Missouri has never licensed an abortion facility.

**24.** D & E is the only type of abortion sought to be performed at 16 weeks or greater in the non-hospital setting. The procedure involves dilatation of the cervix and then evacuation of the contents from the uterus. Dilatation may be achieved atraumatically by insertion of laminaria, synthetic water-absorbant dilators, placed in the cervix 1–2 days prior to the abortion procedure. Testimony of Dr. Warren Hern. The evidence of the safety of the D & E method over other procedures at this stage has been well-established. *City of Akron,* 462 U.S. at 435, 103 S.Ct. at 2495–96; Testimony of Drs. Robert Crist, Warren Hern, Carl Pearman, and Judith Widdicombe, R.N. Peterson, Berry, Grace and Gulbranson, "Second-Trimester Abortion by Dilatation and Evacuation: An Analysis of 11,747 Cases," 62 *Obstetrics & Gynecology* 185, 190 (1983).

**25.** Testimony of Dr. Robert Crist; Testimony of Judith Widdicombe, R.N.; *see also* G. Schaefer, M.D. and E. Graber, M.D.; *Complications in Obstetric and Gynecologic Surgery* 86 (1981): R. Hatcher, M.D., *Contraceptive Technology, supra* note 7 at 274.

**26.** Dr. Crist testified that most hospitals have very restrictive policies regarding abortions. Consequently, physicians functioning primarily through hospitals are relatively inexperienced in abortion procedures.

**27.** Testimony of Dr. Crist; R. Hatcher, *Contraceptive Technology* 1986–1987, *supra* note 7 at 275.

**28.** Testimony of Dr. Warren Hern. However, Dr. Hern recommends that outpatient D & Es in gestations of 17 weeks or greater L.M.P. should occur within 20 minutes of a full-service hospital. Hern, "Serial Multiple Laminaria and Adjunctive Urea in Late Outpatient Dilation and Evacuation Abortion," 63 *Obstetrics and Gynecology* 548 (1984).

In Dr. Hern's review of D & E abortions performed between 17 and 25 weeks gestation, only 3 patients out of 1000 were hospitalized for bleeding. Only two required transfusions. Also, one of these hemorrhages did not occur until 4 weeks after the procedure. *Id.*

**29.** Testimony of Dr. Crist; Testimony of Dr. Hern.

**30.** Testimony of Dr. Crist; Testimony of Dr. Hern.

**31.** Testimony of Dr. Hern.

size that non-hospital D & Es constitute the prevailing practice of post-sixteen-week abortions in Missouri and other states.[32] Yet, plaintiffs do concede that abortions on certain high-risk patients should be performed in the hospital setting. They insist, however, that the decision should be made at the physician's discretion, rather than by an arbitrary state law.

Defendants provided evidence that the mortality rate for D & E abortions increases significantly after 16 weeks gestation.[33] However, there is no indication that hospitalization would result in a lower morbidity or mortality rate. More specifically, the State has relied on cross-examination testimony of Judith Widdicombe, R.N., who cited a complication rate for post–16–week abortions, reflected in RHS' data, which appears to be twice as high at RHS than for such procedures performed elsewhere in the state. Ms. Widdicombe explained that the statistics are misleading because the state data, in contrast to the RHS data, reflects primarily only those complications which occur within the first three days.[34]

Finally, defendants point to a lack of agreement within the medical community regarding hospitalization for abortions as evidence of the reasonableness of § 188.025.[35]

The Court has carefully considered the wealth of expert evidence presented by the parties in light of the appropriate standard of review, which places the burden of justifying the hospitalization requirement on the State. The Court concludes that the requirements of § 188.025 are overbroad. The State did not prove that a D & E abortion at 16–18 weeks gestation can reasonably be considered more dangerous when performed in a qualified free-standing outpatient facility rather than in a hospital. In fact, the evidence suggests that the prevailing medical practice is for such procedures to be performed outside the hospital setting. Because § 188.025 significantly impacts on a woman's access to abortion, and the State has failed to prove that the 16–week hospitalization requirement reasonably relates to the State's interest in maternal health, this provision is invalid.

32. Dr. Stanley Henshaw testified that data from 6 states including Missouri in 1983 revealed that 77.9% of D & Es at 16 weeks or later were non-hospital procedures. The parties stipulated as to the statistics in Missouri.

33. Annual Summary for 1981, Centers for Disease Control, Abortion Surveillance 43, Dept. of Health & Human Services (issued 1985). The table upon which defendants rely refers to abortions for the years 1977–1981. The death rate for D & Es at 16–20 weeks gestation is 7.6 per 100,000 abortions. However, it is not clear whether the gestation time is L.M.P. or actual time since conception.

Defendants' witness, Dr. D. Martin, cited a study by Dr. William Peterson in August, 1983, as revealing a "total percent" complication rate of 5.5% ("one in twenty") for second trimester abortions. However, this testimony is grossly misleading and inaccurate because Dr. Martin added all complications together, apparently assuming that the individual complications or symptoms do not accompany each other. *See* Peterson, *supra* note 24, 62 *Obstetrics & Gynecology,* at 189–90.

34. Defendants refute this and note that State law, § 188.052, requires only that abortion complications be reported within 45 days from the date of post-abortion care. Ms. Widdicombe's testimony also revealed that State prisoners have received abortions at more than 16 weeks gestation at RHS, having been transported and

escorted by prison employees. The Court assumes that the State's interest in maternal health applies to these women as well.

35. A 1983 article, cited by defendants, suggests that D & E is appropriate in free-standing clinics "through fifteen and perhaps seventeen weeks if strict standards are carefully established and monitored on an ongoing basis." Peterson, et al., "Second Trimester Abortion by Dilation and Evacuation: An Analysis of 11,747 Cases," 62 *Obstetrics and Gynecology* 189 (1983).

In 1981, Willard Cates, M.D., and David A. Grimes, M.D., published that 16 weeks gestation would be the outer limit for non-hospital abortions "at the present time." Cates and Grimes, "Deaths from Second Trimester Abortion by Dilation and Evacuation: Causes, Prevention, Facilities," 58 *Obstetrics and Gynecology* 401, 407 (1981). However, in response to a letter to the editor by Dr. Hern criticizing this 16–week threshold, the authors stated that they had not included all data and had intended only a general guideline in order to challenge regulations requiring hospitalization for *all* second trimester procedures. They concluded: "Proposed changes should be based on scientific evidence gathered through ongoing surveillance, ... rather than on unsubstantiated opinions. Dr. Hern's experience is testimony to this principle." 60 *Obstetrics & Gynecology* at 667–68 (1982). Accordingly, the Court cannot accept Cates' and Grimes' 1981 16–week criteria as convincing evidence to support this regulation.

## VI. § 188.029—Required Tests to Determine Gestational age and Viability

Section 188.029 [36] prescribes that a physician must determine whether the fetus is viable before performing an abortion on a woman who the physician has reason to believe is twenty or more weeks pregnant. The statute further dictates that the physician accomplish "such medical examinations and tests as are necessary to make a finding of the gestational age, weight and lung maturity" of the fetus. The findings must be recorded in the woman's medical record.

■ Obviously, the purpose of this law is to protect the potential life of the fetus, rather than to safeguard maternal health. A state's interest in the potentiality of human life becomes compelling only at viability, the point at which the fetus "has the capability of meaningful life outside the mother's womb." *City of Akron*, 462 U.S. at 428, 103 S.Ct. at 2491, *quoting Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731. At this point, the state may regulate or even proscribe abortions, except where necessary to preserve the life or health of the woman seeking the abortion. *City of Akron*, 462 U.S. at 428, 103 S.Ct. at 2491; *Roe*, 410 U.S. at 164, 93 S.Ct. at 732. However, the State may only regulate in such context if it narrowly tailors its regulations to the precise State interest at stake. *Roe*, 410 U.S. at 165, 93 S.Ct. at 732.

Plaintiffs assert that the section is unconstitutional because it burdens abortion in the interest of fetal life prior to viability, suffers from vague language which does not protect a physician's good faith medical judgment, requires unnecessary tests which may put the woman's health in jeopardy, and does not provide a medical-emergency exception where the woman's life or health is in danger.

The statute's requirement that the physician make a specific viability determination whenever "he has reason to believe" that a woman is carrying a fetus of 20 weeks or more gestational age is said to be constitutionally overbroad because the medical evidence is uncontradicted that a 20-week fetus is *not* viable. Testimony by medical experts for both plaintiffs and defendants, in addition to recent medical literature, provides clear evidence that 23½ to 24 weeks gestation is the earliest point in pregnancy where a reasonable possibility of viability exists.[37]

Defendants, in opposition, assert that the 20-week requirement is reasonable because it does not restrict abortions prior to viability, but merely states a point when the physician is required to *determine* viability. The State insists that if a physician initially has reason to believe a woman is 20 weeks pregnant, further examination may well reveal that she is actually 24 weeks pregnant, and thus carrying a potentially viable fetus. In support of this argument, defendants cite to the fact that a woman's related history of the time of her last menstrual period, which is often the first indicator to the physician of gestational age, is also the least reliable. The evidence revealed that inaccuracies of up to four weeks are not uncommon.[38]

---

**36.** 188.029 reads:

**Physician, determination of viability, duties**

Before a physician performs an abortion on a woman he has *reason to believe* is carrying an unborn child of twenty or more weeks gestational age, the physician shall first determine if the unborn child is viable by using and exercising that degree of care, skill, and proficiency commonly exercised by the ordinarily skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions. In making this determination of viability, the physician shall perform or cause to be performed such medical examinations as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child and shall enter such findings and determination of viability in the medical record of the mother.

(L.1986, H.B. No. 1596, § A.)

**37.** Testimony of Drs. Debabrata Maulik, William J. Keenan, and Carl C. Pearman; Gerdes, Abbasi, Bhutani and Bowen, *Improved Survival and Short-term Outcome of Inborn "Micropremies"*, 25 Clinical Pediatrics 391, 393 (1986); Pleasure, Dhand and Kaur, *What is the Lower Limit of Viability?*, 138 American Journal of Diseases of Children 783 (1984); Buckwald, Zorn and Egan, *Mortality and Follow-up Data for Neonates Weighing 500–800 g at Birth;* 38 American Journal of Diseases of Children 779 (1984).

**38.** Testimony of Drs. Debabrata Maulik, Robert Crist and William J. Keenan.

■ The law is well-settled that a decision on fetal viability is properly within the discretion of a physician's professional judgment. *Colautti*, 439 U.S. at 388–89, 99 S.Ct. at 462; *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 64, 96 S.Ct. 2831, 2839, 49 L.Ed.2d 788 (1976). The Court is satisfied that the legislature has not attempted to usurp this function by obligating a physician to exercise that judgment at a point in pregnancy when a reasonable possibility exists that the fetus may be viable. If the menstrual history *or* other signs and symptoms do not initially indicate a gestation of at least 20 weeks, then obviously the fetus is not viable. Further tests to determine viability are unnecessary and not required by law.

In assessing viability, Section 188.029 mandates that the physician "us[e] and exercis[e] that degree of care, skill and proficiency commonly exercised by the ordinarily skillful, careful, and prudent physician engaged in similar practice under the same or similar conditions." The Act's penalty section provides that

"[A]ny person who contrary to the provisions of sections 188.010 to 188.085 knowingly performs ... any abortion or knowingly fails to perform any action required [these] sections ... shall be guilty of a class A misdemeanor." Mo. Rev.Stat. § 188.075 (1983)

, Plaintiffs argue that the objective standard of care set forth in Section 188.029, in conjunction with the imposition of criminal liability, is unconstitutional because a physician's erroneous, but good faith assessment of viability is not a defense. Consequently, without a subjective culpability requirement incorporated in Section 188.029, it is claimed that the fear of criminal penalties would exert a chilling effect. Plaintiffs contend that physicians will be unwilling to perform abortions close but prior to that critical time of viability, even if the physician's medical judgment is that the fetus could not sustain life outside the womb. This result, plaintiffs insist, would constitute an impermissible obstacle to a woman's access to abortion services.

Furthermore, plaintiffs contend that the phrase "reason to believe" renders the statute unconstitutionally vague because it does not describe the standard to govern the physician's assessment whether the fetus is 20 weeks gestation age. The State counters that Section 188.075 sets forth a scienter requirement which must be proved beyond a reasonable doubt before criminal liability can be imposed.

The culpability provision in Section 188.-075 was previously interpreted in *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 655 F.2d 848 (1981), *aff'd in part and rev'd in part on other grounds* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). In *Ashcroft*, the Eighth Circuit Court of Appeals held that Section 188.075 requires *knowledge* as a mental state in order to violate one of the sections to which that statute refers. "A good faith determination of nonviability would be a defense." *Id.*, 103 S.Ct. at 862. The Appellate Court further elaborated on the definition of "knowledge" as contemplated by the legislature:

"In this case, Section 188.075 prescribes 'knowingly' as the mental state; and Missouri statutes further define 'knowingly':

A person *'acts knowingly'* or with knowledge,

(1) with respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

(2) with respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result."

Mo.Rev.Stat. § 562.016.3, *quoted in Ashcroft*, 655 F.2d at 862.

■ Accordingly, the Court concludes that the Missouri statutes would require the State to prove culpability for each element of Section 188.029. Hence, a physician's good faith assessment of viability or whether the woman is at least 20 weeks pregnant would be conclusive. The statute is neither vague nor otherwise unconstitutional in this respect.

Plaintiffs' next attack on Section 188.029 centers on the obligation that, in determining viability, "the physician shall perform or cause to be performed such medical examinations and tests as are necessary to make a finding of the gestational age, weight and lung maturity" of the fetus.

Dr. Robert Crist testified that tests to determine fetal weight are not only unreliable and inaccurate, but also add $125 to $250 to the cost of abortion. He stated that this type of test would be appropriate only at a point "much later" in pregnancy. No evidence is cited which rebuts this. It was also clearly established that the only method to evaluate lung maturity is by amniocentesis,[39] an expensive procedure which all witnesses agreed would be useless and contrary to accepted medical practice until at least twenty-eight to thirty weeks of gestation.[40]

The State has failed to demonstrate that either of these requisites are narrowly tailored to further the State's interest in either maternal health or the life of the fetus when imposed at a point when the woman is only 20–24 weeks pregnant. Moreover, amniocentesis imposes additional significant health risks for both the pregnant woman and the fetus.[41] Even where the state exercises its compelling interest in a viable fetus, it may not require action that imposes an increased risk to the woman's health. *Thornburgh v. American College of Obstetricians*, — U.S. —, 106 S.Ct. 2169, 2184, 90 L.Ed.2d 779 (1986).

Medical experts for both plaintiffs and defendants concurred that it is standard medical practice to determine "gestational age" by ultrasound examination[42] and fetal skull measurements whenever it appears that a woman is at least twenty weeks pregnant.[43] Defendants have further acknowledged that no tests other than the ultrasound measurements provide information necessary to determine viability prior to at least 30 weeks gestational age.[44] Despite such concessions, the State defends this statutory language and maintains that the section demands only those examinations which are "necessary" to make the required findings. Thus, defendants insist that there is no duty to perform an amniocentesis for lung maturity or even a fetal weight determination if these tests would be futile. However, the ultrasound exam would be mandatory.

This evidence must be evaluated in light of the Supreme Court's declaration that the point of viability, which may differ with each pregnancy, is a matter of medical judgment, and that "neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor." *Colautti v. Franklin*, 439 U.S. at 388, 99 S.Ct. at 682.

■ Given this deference to a physician's clinical judgment, first expressed in *Roe*, 410 U.S. at 163, 93 S.Ct. at 731, the Court concludes that the final sentence of Section 188.029 is an impermissible legislative intrusion upon a matter of medical skill and judgment. Even though the standard medical practice is to establish gestational age, a correspondent to viability,[45] whenev-

---

**39.** The amniocentesis procedure involves the withdrawal of amniotic fluid from the uterus via needle puncture through the woman's abdomen. The fluid is then analyzed to measure the level of certain chemicals which indicate lung maturity. The procedure must be performed in conjunction with sonography. Testimony of Dr. Debabrata Maulik.

**40.** Testimony of Drs. D. Maulik, Carl Pearman, Robert Crist, and William Keenan. Dr. Maulik also estimated that the cost of the procedure at Truman Medical Center was $200–$250.

**41.** The risk of infection to the woman was specifically cited. There is also the possibility of "fetal-waste" or actual loss of the fetus from amniocentesis. Testimony of Drs. Debabrata Maulik, Robert Crist and Carl Pearman. Further, there is normally a delay of approximately two weeks in scheduling a nonemergency amniocentesis. Testimony of Dr. D. Maulik. The parties have stipulated that delay increases the risk of an abortion.

**42.** The "ultrasound" or "sonogram" examination is a noninvasive procedure which utilizes high frequency sound waves to visualize the fetus. Measurements can then be taken of the fetal skull or biparietal diameter (BPD). The BPD measurement is considered the most accurate method of determining gestational age. Testimony of Dr. Debabrata Maulik.

**43.** Testimony of Drs. Debabrata Maulik, Robert Crist, Carl Pearman, Warren Hern and William Keenan. Judith Widdicombe, R.N., further testified that this examination to determine gestational age is performed on every woman seeking a second trimester abortion at RHS.

**44.** Defendants' post-trial brief *citing* the testimony of Drs. William Keenan, Debabrata Maulik and Robert Crist.

**45.** Testimony of Dr. Debabrata Maulik.

er it appears that the last menstrual period was at least 20 weeks before,[46] the State may not dictate that a physician make a "finding" of gestational age in order to determine viability. Consequently, the Court also rejects defendants' interpretation that only those tests which are "necessary" to do so must be performed. The State may not dictate either the tests *or* the findings which enter into a decision whether or not a fetus is viable.

Finally, plaintiffs allege that Section 188.029 must be declared unconstitutional because it does not provide an exception for the situation where the health of the mother is endangered. In support, plaintiffs rely on *Thornburgh v. American College of Obstetricians*, 106 S.Ct. at 2184. In *Thornburgh*, the Supreme Court invalidated a Pennsylvania statute which set forth a second-physician requirement without a medical emergency clause, concluding that the omission was intentional.

However, this Court is convinced that the Missouri legislature did not intend to impose liability on the physician who fails to make a determination of viability prior to performing an emergency abortion where the woman's life or health is endangered. Such an interpretation would conflict with a previously enacted section which provides, in accordance with Supreme Court mandate, that a post-viability abortion is not proscribed where necessary to preserve the life or health of a woman. Mo.Rev. Stat. § 188.030 (Supp.1984); *Planned Parenthood v. Ashcroft*, 103 S.Ct. at 2521.

It is an established rule of statutory construction in Missouri that an interpreting court should seek to ascertain and give effect to the legislative intent if possible.

*State v. Kraus*, 530 S.W.2d 684 (Mo.1975) (en banc). Statutes which relate to the same subject matter should be harmonized if possible so that all provisions are meaningful. *State ex rel. Lebeau v. Kelly*, 697 S.W.2d 312, 315 (Mo.Ct.App.1985). Accordingly, the initial sentence of § 188.029 which directs when a physician must make a judgment on viability must be harmonized with Section 188.030, which includes a medical emergency exception.

The Court finds that the final sentence of Section 188.029 is not "essentially and inseparably connected with, and ... dependent upon" the valid requirements initially set forth. *See* Mo.Rev.Stat. § 1.140. Thus, it is presumed that the legislature would have enacted the portion declared constitutional independently from the latter void provisions. *Id.* Accordingly, the last sentence of the section will be severed and stricken, allowing the remainder of the statute to stand. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985).

**VII. § 188.205, 188.210, 188.215 (Sections 2, 3, 4 of "the Act"): Use of Public Funds, Public Employees and Public Facilities to Perform/Assist or Encourage/Counsel to have an Abortion**

Plaintiffs' final challenges to the 1986 Missouri Act are directed at the provisions which prohibit the expenditure of public funds, actions of public employees and use of public facilities "for the purpose of 'performing or assisting an abortion' and 'encouraging or counseling a woman to have an abortion' if it is not necessary to save her life." Mo.Rev.Stat. §§ 188.205, 188.-210, 188.215.[47] Plaintiffs assert that all

---

**46.** Testimony of Drs. Debabrata Maulik, Robert Crist, Warren Hern, Carl Pearman, William Keenan, and Judith Widdicombe, R.N.

**47.** Sections 2, 3, and 4 of "the Act" have been codified at Mo.Rev.Stat. §§ 188.205, 188.210, and 188.215, respectively. Hereinafter, these sections will be identified by the statutory section number as codified. The text is as follows:

**§ 188.205. Use of public funds prohibited, when**
It shall be unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encour-

aging or counseling a woman to have an abortion not necessary to save her life.
(L.1986, H.B. 1596, § A (§ 2).)

**188.210. Public employees, activities prohibited, when**
It shall be unlawful for any public employee within the scope of his employment to perform or assist an abortion, not necessary to save the life of the mother. It shall be unlawful for a doctor, nurse or other health care personnel, a social worker, a counselor or persons of similar occupation who is a public employee within the scope of his public employment to encourage or counsel a woman to have an abortion not necessary to save her life.
(L.1986, H.B. No. 1596, § A (§ 3).)

three of these sections are constitutionally flawed.

First, it is claimed that the phrase "encouraging or counseling" is impermissibly vague. Plaintiffs further contend that even if not vague, the restrictions on "encouraging and counseling" infringe on the woman's First and Fourteenth Amendment rights, and on the physician's freedom of speech. Next, plaintiffs claim that the limitations on the use of "public facilities" imposed by Section 188.215 unconstitutionally restrict access to abortions. Moreover, the proscriptions on the use of public funds and activities of public employees allegedly results in the denial of medical care to prisoners seeking abortions, an Eighth Amendment violation. Finally, the plaintiffs insist that the three sections together intrude on academic freedom by effectively removing clinical instruction of abortion procedures from the state medical school curriculum.

On cross-motions for summary judgment, both parties originally requested that the validity of these sections be determined as a matter of law. However, the Court determined in the interest of justice that both motions should be denied in order that the case and record be fully developed. *See McLain v. Meier*, 612 F.2d 349, 356 (8th Cir.1979).

### A. *Vagueness*

Plaintiffs maintain that Sections 188.205, 188.210 and 188.215 are unconstitutional because the statutory language, "encouraging or counseling," only vaguely describes the proscribed conduct. Hence, it is argued that these laws impermissibly threaten to inhibit the exercise of free speech.

The Supreme Court enunciated the dangers of vague laws in *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972):

> "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." (footnotes omitted)

The standard for evaluating the degree of clarity that the Constitution demands depends on the type of legislative Act. Here, defendants focus on the civil nature of these sections,[48] noting that the Su-

---

**188.215.** Use of public facilities prohibited, when

It shall be unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.
(L.1986, H.B. No. 1596, § A (§ 4.))
Definitional language is set forth in Mo.Rev. Stat. § 188.200 (previously Section 1 of "the Act"), which provides:
**§ 188.200. Definitions**
As used in sections 188.200 to 188.220, the following terms mean:
(1) **"Public employee,"** any person employed by this state or any agency or political subdivision thereof;

(2) **"Public facility,"** any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivision thereof;
(3) **"Public funds,"** any funds received or controlled by this state or any agency or political subdivision thereof, including, but not limited to, funds derived from federal, state or local taxes, gifts or grants from any source, public or private, federal grants or payments, or intergovernmental transfers.

**48.** Although it is clear that these sections do not impose criminal penalties, it is uncertain what punishment attaches to the "unlawful" acts. Section 188.220 sets forth taxpayer standing to bring suit:

preme Court has expressed greater tolerance of imprecision in such laws. *Village of Hoffman Estates v. Flipside, Hoffman Est.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). However, the *Flipside* court concluded that "perhaps the most important factor" in determining the required precision is whether the law "threatens to inhibit the exercise of constitutionally protected rights." *Id.* A more stringent vagueness test applies if the challenged law may exert a chilling effect on free speech. *Id.*

■ The right to disseminate even commercial abortion information was recognized in *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). First Amendment freedoms of expression are clearly involved where the statute places restrictions on "encouraging or counseling" women to have abortions. *See Young Women's Christian Ass'n of Princeton, New Jersey v. Kugler*, 342 F.Supp. 1048, 1063 (D.N.J.1972). Consequently, strict judicial scrutiny is warranted in evaluating this vagueness challenge.

Noting the subjective nature of the words "encourage or counsel," plaintiffs insist that physicians and other health professionals will "steer far wider [than] the unlawful zone" and avoid any discussion of abortion with their patients in order to avoid violating the law. *See Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299. There was evidence that all staff and resident physicians at Truman Medical Center were instructed by the Executive Director not to make "any ... comment relative to abortion" which is "not necessary to save the life of the mother."[49] A memorandum by Department of Health Director, R. Har-

mon, M.D., revealed his belief that "[p]ublic facilities and employees under this bill will probably cease to mention abortion out of fear of prosecution."[50] Dr. Debabrata Maulik also testified that the prohibition on "encouraging or counseling a woman to have an abortion" would leave a physician uncertain in distinguishing between lawful and unlawful discussions with patients.[51] The Court considers these interpretations only as evidence that health professionals may steer their conduct far wider than the lawful zone.

The State's counterargument is that the statutory language "encouraging or counseling" is designed to forbid only "affirmative advocacy" of abortions not necessary to save a woman's life. Defendants assert that the prohibition does not prevent a physician from informing a woman of "all options" or the "pros and cons" of an abortion. Further, defendants insist that even if Sections 188.210 and 188.215 must fail, Section 188.205 is *not* directed at any plaintiff, either as a physician or other health care provider, but only at "state and local officials or legislative bodies responsible for expending public funds."

■ Having applied the appropriate rigid standard here where the challenged statutes abut upon First Amendment freedoms, the Court concludes that Sections 188.205, 188.210 and 188.215 are sufficiently vague to render them unconstitutional. If men of common intelligence must speculate on a statute's meaning and differ as to its application, then a law is so vague that it violates due process. *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). Even though a penal statute is not involved here, it is

"Any taxpayer of this state or its political subdivisions shall have standing to bring suit in a circuit court of proper venue to enforce the provisions of sections 188.200 to 188.215."

**49.** Memo from James J. Mongan, M.D., Executive Director of Truman Medical Center, dated July 11, 1986. (Plaintiffs' Exhibit 12). The memo sets forth the provisions of § 188.215 and concludes that:
 [A]ll personnel ... *MUST* [emphasis in original] discontinue all abortion related activity not necessary to save the life of the mother. Since this, of course, includes counseling about abortions and referring patients for abortions to other facilities, there is no alter-

native but to respond to inquiries about abortion to the effect that Missouri Law prohibits TMC from performing abortions and further prohibits counseling, referring or any other activity whatsoever relating to abortion not necessary to save the life of the mother. Any other comment relative to abortion is prohibited.

**50.** Memo review of House Bill No. 1596 by R. Harmon, M.D., Director of Department of Health, Review dated April 28, 1986, at page 4. (Plaintiffs' Exhibit 13).

**51.** Dr. Maulik stated that the resulting impact on the medical practice would be "devastating."

clear that the phrase "encouraging or counseling" elicits vastly different interpretations of the scope of the forbidden activity. The Supreme Court disapproved of similar terms such as "counsel," "advocate" and "advise" in the loyalty oath cases of 1960s because the language was "not susceptible of objective measurement" and threatened to restrict free speech. *Id; Cramp v. Board of Public Instruction,* 368 U.S. 278, 286, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

Moreover, the Court is unpersuaded by the defendants' contention that Section 188.205, which relates to "public funds," could not apply to inhibit the free speech of any health care provider. The definition of "public funds" set forth in Section 188.200 certainly is broad enough to make "encouraging or counseling" unlawful for anyone who is paid from "funds derived from federal, state or local taxes, gifts or grants from any source, public or private, federal grants or payments, or intergovernmental transfers." § 188.200.

Having determined that these sections are void for vagueness, it is not essential to the outcome to address the additional grounds of unconstitutionality advanced by plaintiffs. However, the Court shall enter its findings and conclusions on each of plaintiffs' claims for purposes of appellate review.

### B. *"Encouraging or Counseling"—First and Fourteenth Amendment Claims*

Even if the phrase "encouraging or counseling" was deemed to be sufficiently precise, plaintiffs contend that these sections interfere with a physician's ability to competently and professionally counsel patients, and the patient's opportunity to receive such information. As the Court has noted above, this activity is certainly within the realm of First Amendment protection. *See Kugler,* 342 F.Supp. at 1063.

Further, the United States Supreme Court has recognized that the right of privacy, founded in the Fourteenth Amendment's concept of personal liberty, requires that a physician be given "the room he needs to make his best medical judgment." *Doe v. Bolton,* 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973). Assisting a woman in deciding whether or not to have an abortion is included in the exercise of this medical judgment. *Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979); *City of Akron,* 462 U.S. at 427–430, 103 S.Ct. at 2490–93. Until the State has a compelling interest in either maternal health (approximately at the end of the first trimester) or fetal life (at viability), "a pregnant woman must be permitted, in consultation with her physician to decide to have an abortion and to effectuate that decision "free of interference by the State." *Akron,* 462 U.S. at 429, 103 S.Ct. at 2492, *quoting Roe,* 410 U.S. at 163, 93 S.Ct. at 731. Even where the State has an interest in preserving the fetus, a state may "not impose an increased risk to the life *or health* of the woman." *Thornburgh,* 106 S.Ct. at 2184 (emphasis added).

Plaintiffs insist that by prohibiting certain physicians and health care professionals from advocating an abortion that is "not necessary to save the woman's life," the statute intrudes on the physician-client relationship when the mother's *health* may be adversely affected, even if it is not an immediately life-threatening condition.[52] There was unchallenged testimony presented at trial that in such situations a physician has a professional duty to at least suggest or even urge the pregnant woman to have an abortion.[53]

---

**52.** Dr. Maulik testified that an abortion is medically preferable where there are gross fetal anomalies, such as Down's Syndrome, Trisomy 18, and renal agenesis (the two latter conditions being lethal to the infant shortly after birth), or where maternal *health* may be compromised by cardiac disease, recurrent cerebral vascular accidents (CVAs or strokes), diabetic retinopathy (which threatens blindness) and renal disorders.

As a referral center, Dr. Maulik testified that TMC routinely serves patients with these problems.

Dr. Carl Pearman testified that almost all second trimester abortions performed at the University of Missouri Medical Center in Columbia (UMMC) are performed for the mother's *health,* though not necessarily to preserve her *life,* as with breast cancer or early amniotic sac rupture. *Accord,* Testimony of Dr. Warren Hern. *See also McRae v. Califano,* 491 F.Supp. 630, 669–76 (E.D.N.Y.1980), *rev'd on other grounds sub. nom Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

**53.** Dr. Maulik testified that the fear of civil liability and an ethical obligation would compel him to "strongly recommend," though never "force a decision" to have an abortion because

Defendants argue that the statutes prohibit only the "advoca[cy] of an unnecessary abortion [which] goes beyond the realm of the physician-client relationship discussed in *Akron.*" The State also submits that

"these sections do not have any impact whatsoever upon a private physician's ability to recommend any course of action he desires to a patient. He simply cannot be compensated by public funds [§ 188.205] or perform the abortion or persuade the woman to obtain the abortion while working in a public facility. [§§ 188.210 and 188.215.]" [54]

Defendants rely on those Supreme Court cases which held that the government is not obligated to *fund* abortions, whether or not medically necessary, as authority for the constitutionality of these restrictions on public funds, public employees and public facilities. *See Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

The *Maher* court held that a state may make a policy choice favoring childbirth over abortions, and thus need not *remove* obstacles such as indigency in the path of a woman's exercise of her freedom of choice. *Maher,* 432 U.S. at 480, 97 S.Ct. at 2386. However, the state may not place obstacles in the path of free choice. *Harris,* 448 U.S. at 316, 100 S.Ct. at 2688.

 This Court concludes that the prohibitions on speech set forth in these sections impose a significant barrier to a woman's right to consult with her physician and exercise her freedom of choice. *See Akron,* 462 U.S. at 427, 103 S.Ct. at 2491.

Patients who fully pay for their services would be denied access to medical information which may affect their decision whether to continue the pregnancy, perhaps enduring health risks. Here, the State is not asked to subsidize abortions or the exercise of First Amendment rights.[55] The Court further rejects defendants' narrow construction that the sections would only affect a woman "being affirmatively counseled to have an abortion and to *obtain that* abortion in a public facility." [56] (emphasis added.) The statutory language is obviously broader than this interpretation.

### C. § 188.215—Restrictions on Use of Public Facilities

Plaintiffs challenge the provisions in Section 188.215 which make it unlawful for any public facility to be used for "performing or assisting" or "encouraging or counseling" a woman to have an abortion if it is not necessary to save her life.

Defendants submit that such restrictions are justified by the Supreme Court's holding in *Poelker v. Doe,* 432 U.S. 519, 520, 97 S.Ct. 2391, 2392, 53 L.Ed.2d 528 (1977), which denied an indigent woman the right to obtain a nontherapeutic abortion at a St. Louis public hospital where the City's policy was to deny funds for such abortions. The Court, however, finds *Poelker* uncontrolling here where there is no indication that "public funds" would be expended. Plaintiffs claim that these prohibitions are impermissible as applied to patients who seek to obtain and *pay for* such services at a public facility. The Eighth Circuit's holding in *Nyberg v. City of Virginia (Nyberg II),* 667 F.2d 754 (8th Cir.1982) supports this position.

---

of a woman's non-life-threatening health interests. A prohibition on this would be "devastating" to a medical practice. He further testified that it would be "dishonest" to merely discuss abortion as an option without a recommendation of "what in [his] judgment is the best possible course in terms of [the woman's] health and survival."

Dr. Carl Pearman also stated that he feels an ethical and professional obligation to give advice whether to choose abortion when requested by the patient to do so. If this were prohibited by law, Dr. Pearman stated that he would be forced to either violate the law or quit caring for patients who present with such health complications during pregnancy.

**54.** Defendants' brief in opposition to plaintiffs' motion for summary judgment, at 29.

**55.** Mr. Richard Chern, Associate Administrator of Finance at Truman Medical Center, testified that the full cost of abortions at TMC are recovered from the patient, without any sliding scale for indigency.

Similarly, Dr. Carl Pearman testified that his private practice patients who are occasionally seen at the University of Missouri Medical Center are charged a full fee.

**56.** Defendants' brief in opposition to plaintiffs' motion for summary judgment, at 32.

In *Nyberg II,* the Court of Appeals noted the "fundamental difference between providing direct funding to effect the abortion decision and allowing staff physicians to perform abortions at an existing publicly owned hospital." The Eighth Circuit observed that *Poelker* did not hold that a state may prevent physicians from performing paid abortions in the hospital. *Id.* at 758 n. 1. While it is true, as defendants argue, that in *Nyberg II,* the public facility was the only hospital in the community,[57] the gravamen of the holding was that there was no direct public expenditure and that abortion services would be provided only to paying patients.[58] Accordingly, the Court is convinced that § 188.215 is also unconstitutional for the reasons set forth in *Nyberg II.*

**D.** *"Assisting" an Abortion with Public Funds or by Public Employees— Eighth Amendment Claim*

Plaintiffs' fourth alternative challenge to the provisions which restrict public fund expenditures and assistance by public employees focuses on the Eighth Amendment rights of Missouri inmates to receive medical care. Although this argument was not raised previously and defendants have not responded, the Court considers this claim to be meritorious.

Plaintiffs contend that these provisions will effectively deny women inmates access to outside medical facilities for medically necessary, yet non-life-threatening abortions. Testimony at trial revealed that plaintiff RHS has performed abortions on prisoners from State institutions. The pa-

tients are transported in State vehicles and accompanied by two State employees. It is also evident that abortion facilities are not available at all the penal institutions in Missouri.[59]

The essence of plaintiffs' claim here is that the required escorted assistance and transportation by prison employees will be precluded by Sections 188.205 and 188.210. Consequently, women prisoners will be unable to terminate pregnancies which seriously threaten their health, even though their lives are not in immediate danger.[60]

In *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (citing *Gregg v. Georgia,* 428 U.S. 153, 182–83, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). Although there is no controlling authority that the prisoners' lack of access to a non-life-threatening abortion falls within the *Estelle* rule, the facts and law certainly indicate that a "serious medical need" may exist and the absolute statutory roadblock may constitute "deliberate indifference" to such needs. A New Jersey district court recently addressed a similar claim against a county jail policy in *Monmouth County Correctional Institution Inmates v. Lanzaro,* 643 F.Supp. 1217 (D.N.J.1986), finding an Eighth Amendment violation. The *Lanzaro* court further held that the desired abortions were "serious medical needs" which must be provided at government expense because the prisoners' incarceration resulted in financial dependency.[61]

---

**57.** Moreover, TMC is a public facility which performed 97% of all hospital-based abortions at 16–week or greater gestation in 1985 (stipulation of facts). All patients must pay in full (Testimony of Mr. Richard Chern). The Court has declared § 188.025 to be unconstitutional. However, if all 16–week or greater abortions were required to be performed in a hospital, TMC essentially would be the only available facility.

**58.** See *supra* note 55.

**59.** Testimony of Judith Widdicombe, R.N. The inmate patients, usually shackled and/or handcuffed, have been accompanied by a matron and driver. Two trips are required if the gestation is 16 weeks or greater because laminaria must be inserted at least one day before the abortion procedure. See *supra* note 24.

**60.** See *supra* note 52 for medical testimony of such conditions.

**61.** In *Lanzaro,* the district court considered it "extremely significant" that federal prisons are obligated to provide abortion counseling and assistance. 28 C.F.R. § 551.23 (1986) provides:

*Abortion*

(a) The inmate has the responsibility for deciding to have an abortion or bear the child.

(b) The Warden shall provide medical, religious and social counseling to aid the inmate in making the decision to have an abortion or bear the child.

(c) An inmate shall sign a statement of responsibility for the decision to have an abortion or bear the child.

(d) At the inmate's request, medical staff shall arrange for the abortion to take place at a hospital or clinic outside the institution.

The Court does not determine here that public funds must actually be expended to pay for a prisoner's therapeutic abortion.[62] However, it is clear that an obstacle to the pregnant prisoner's serious medical needs exists even if she is capable of paying because Section 188.215 appears to make it unlawful for State employees to assist with arranging for the procedure. Moreover, "public funds" would necessarily be involved for salaries and transportation expenses. Hence, these sections violate the Eighth Amendment.

### E. Academic Freedom

Finally, it is claimed that these sections interfere with academic freedom by removing clinical instruction in abortion procedures at state medical schools (public facilities) and by university faculty at any institution (public employees). In support of their legal argument, plaintiffs have relied on First Amendment cases which hold that a state may not forbid the teaching of a certain subject or theory simply because it offends the dominant belief of a community. *See Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1966); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Board of Education v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

Although the defendants have offered no counterarguments, the Court is not persuaded that these sections rise (or fall) to the level of a state-imposed orthodoxy in the educational process. While not directly applicable here, there was conflicting evidence presented at trial as to the necessity of providing clinical instruction in abortion procedures in order for the medical curriculum to be complete.[63] However, the Court is unable to conclude that these sections unconstitutionally interfere with academic freedom.

Accordingly, for the reasons stated above, it is hereby

ORDERED that the following provisions of the 1986 Missouri Act relating to the regulation of abortions are declared to be unconstitutional:

1. § 1.205.1(1) and (2)
2. § 188.039
3. § 188.025
4. The following portion of § 188.029: The second and final sentence which states:
 "In making this determination of viability the physician shall perform or cause to be performed such medical examinations as are necessary to make a finding of the gestational age, weight, and lung maturity of the unborn child and shall enter such findings and determination of viability in the medical record of the mother."
5. § 188.205
6. § 188.210
7. § 188.215

It is further

ORDERED that defendants shall be permanently enjoined from enforcing the provisions declared to be unconstitutional.

### FINAL JUDGMENT ON CONSENT

WHEREAS, on or about December 21, 1984, plaintiffs (by their predecessors in interest) commenced this action, alleging, among other things, (a) that defendant John Hancock Mutual Life Insurance Company is a fiduciary, as defined by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), with respect to the International Brotherhood of Electrical Workers Local Union No. 90 Pension Fund (the "Pension Fund") of which plaintiffs are Trustees, and (b) that defendant breached the duties imposed upon a fiduciary under ERISA by certain acts and omissions relating to contributions placed in defendant's general investment account, which were made to defendant pursuant to the group annuity contract be-

---

**62.** *See Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671.

**63.** Stipulated statement of Harry S. Jonas, M.D., Dean of the University of Missouri-Kansas City School of Medicine (clinical teaching of abortions required for complete medical school curriculum); *Accord,* Testimony of Dr. Carl Pearman.

*Contra,* Testimony of Dr. Daniel Martin (medical schools such as St. Louis University Medical School can competently teach Obstetrics and Gynecology without performing non-life-threatening abortions as part of the curriculum.)

tween the Pension Fund and defendant known as "GAC 738"; and

WHEREAS, defendant answered the complaint on or about March 29, 1985, denying its material averments; and

WHEREAS, Plaintiffs moved this Court, on or about July 3, 1986, for partial summary judgment determining that defendant is a fiduciary, as defined by ERISA, with respect to the Pension Fund (the "Motion"); and

WHEREAS, this Court, by order entered on March 17, 1987, granted the Motion (the "Order"); and

WHEREAS, defendant moved this Court, on or about March 26, 1987, for reconsideration of the Order; and

WHEREAS, this Court, by endorsement order entered on May 1, 1987, granted defendant's motion for reconsideration and, upon reconsideration, adhered to its previous ruling; and

WHEREAS, on May 11, 1987, defendant moved, pursuant to 28 U.S.C. § 1292(b), for certification of the Order for an interlocutory appeal; and

WHEREAS, defendant filed its brief in support of its motion for certification on May 11, 1987; and

WHEREAS, by endorsement orders entered on May 20, 1987, the Court (a) extended plaintiffs' time within which to file their brief in opposition to defendant's certification motion to May 25, 1987, and (b) extended defendant's time to appeal as of right from the Order from May 31, 1987, to and including June 30, 1987; and

WHEREAS, the Court thereafter extended plaintiffs' time within which to file their brief in opposition to June 15, 1987; and

WHEREAS, defendant has advised plaintiffs of its intention to seek appellate review of the Order to the fullest extent permitted by law; and

WHEREAS, the Court, upon consideration of matters set forth in defendant's brief submitted in support of its motion for certification pursuant to 28 U.S.C. § 1292(b), finds that there are genuine issues with respect to whether, in enacting

ERISA, Congress intended that insurance companies be deemed to be fiduciaries, as defined by ERISA, with respect to assets contributed pursuant to group annuity contracts and held in their general investment accounts; and

WHEREAS, plaintiffs and defendant have entered into an agreement for the settlement of this action, a condition precedent to the effectiveness of which is the entry of a final judgment by the Court pursuant to which (a) the Order is withdrawn, set aside and vacated, and made of no further force or effect for use against defendant, its successors and assigns, by plaintiffs, by the Pension Fund or by third parties, for collateral estoppel or other preclusive purposes, and (b) all claims asserted herein are dismissed with prejudice, the parties to bear their own costs and attorneys' fees;

NOW, THEREFORE, it is hereby

ORDERED, that the Order, together with the findings and conclusions embodied therein, is withdrawn, set aside and vacated, and shall be of no force or effect for use against defendant, its successors and assigns, by plaintiffs, by the Pension Fund or by third parties, for collateral estoppel or other preclusive purposes; and it is further

ORDERED, that this action and all claims asserted herein be, and the same hereby are, dismissed with prejudice, the parties to bear their own costs and attorneys' fees.