**REPRODUCTIVE HEALTH SERVICE; Planned Parenthood of Greater Kansas City; Howard I. Schwartz, M.D.; Robert L. Blake, M.D.; Carl C. Pearman, M.D.; Carroll Metzger, R.N.C.; Mary L. Pemberton, B.S.W.; Appellees,**

v.

**William L. WEBSTER; State of Missouri, Appellants.**

**Nos. 87–1641, 87–2157.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1988.

Decided July 13, 1988.

Jerry Short, Asst. Atty. Gen., Jefferson City, Mo., for appellants.

Roger K. Evans, New York City, for appellees.

Before LAY, Chief Judge, McMILLIAN and ARNOLD, Circuit Judges.

LAY, Chief Judge.

Five publicly-employed health care providers and two nonprofit corporations brought this class action against the State of Missouri and its Attorney General (the state), challenging the constitutionality of several sections of Missouri's 1986 abortion-regulation statute.[1] Mo.Ann.Stat. §§ 1.205, 188.010–.220 (Vernon 1983 & 1988 Supp.) (unless otherwise noted, all subsequent section references shall be to Missouri's statutes). The district court declared several portions of the act unconstitutional and permanently enjoined their enforcement. *Reproductive Health Servs. v. Webster,* 662 F.Supp. 407 (W.D.Mo.1987). The state appeals.[2] With one exception, we affirm.

## A. Hospitalization Requirement

■ Section 188.025 of Missouri's abortion statute states: "Every abortion per-

---

1. The district court, the Honorable Scott O. Wright, United States District Judge for the Western District of Missouri, certified a plaintiff class consisting of (1) facilities, Missouri-licensed physicians, or other health care professionals offering abortion counseling and services; and (2) pregnant women seeking abortion services or pregnancy counseling within Missouri.

2. The state appeals from all aspects of the district court's ruling except those relating to the abortion statute's "informed consent" provisions. The court declared unconstitutional the statutory provisions requiring that: (1) the attending physician *personally* advise the pregnant woman of certain information; and (2) the physician inform the woman "whether she is or is not pregnant." *See* § 188.039. Because the state does not appeal these rulings, the constitutionality of these requirements is not at issue here.

formed at sixteen weeks gestational age[3] or later shall be performed in a hospital." Applying the test laid out in *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the district court held this requirement unconstitutional because (1) it significantly impacts on the exercise of the right to abortion by causing delay, increasing costs and health risks, and decreasing accessibility; and (2) the state failed to satisfy its burden of proving that the hospitalization requirement is reasonably related to the state's interest in maternal health.

Although the state asserts that the district court improperly applied *Akron*'s legal standard, its challenge to this ruling is nothing more than an attack on the factual finding that was critical to the court's decision: non-hospitalized abortions at sixteen to eighteen weeks gestational age cannot reasonably be considered more dangerous for pregnant women than hospitalized abortions.[4] Because this finding is not clearly erroneous and because the district court committed no error of law, we affirm on the basis of the district court's opinion. *See also Akron*, 462 U.S. at 430–31, 103 S.Ct. at 2492–93 (regulations that significantly impact access to abortion pre-viability are constitutional only to the extent they reasonably relate to protection of maternal health; state has burden of proving the reasonable relationship); *Planned Parenthood Ass'n v. Ashcroft*, 462 U.S. 476, 482, 103 S.Ct. 2517, 2520, 76 L.Ed.2d 733 (1983) (invalidating, as in *Akron*, statute requir-

ing hospitalization for all second trimester abortions).

## B. Tests to Determine Viability

■ The next challenged portion of Missouri's statute requires doctors to determine whether a fetus is viable before performing an abortion on any woman whom the doctor has reason to believe is twenty or more weeks pregnant. In making the viability assessment, the doctor must determine and record the fetus's gestational age, weight, and lung maturity. § 188.029.

The district court held unconstitutional the requirements that doctors determine gestational age and fetal weight and lung maturity. 662 F.Supp. at 423. The court held that the testing requirements constituted "an impermissible legislative intrusion upon a matter of medical skill and judgment [because] * * * [t]he State may not dictate either the tests *or* the findings which enter into a decision whether or not a fetus is viable." *Id.* (emphasis in original).

As indicated by the district court, the Supreme Court has squarely addressed this point and declared that "neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor." *Colautti v. Franklin*, 439 U.S. 379, 388–89, 99 S.Ct. 675, 682, 58 L.Ed.2d 596 (1979). Nevertheless, this is precisely what the Missouri legislature has attempted to proclaim by requiring doctors to determine the

---

3. Gestational age is measured from the first day of a woman's last menstrual period and is generally two weeks greater than fetal age. The distinction between gestational and fetal age measurement can be legally significant when applying the trimester approach of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Using the gestational age method, the second trimester encompasses the time from 13⅓ through 26⅓ weeks after the last menstrual period, and thus is the time period at issue here.

4. The district court stated:
    The Court has carefully considered the wealth of expert evidence presented by the parties in light of the appropriate standard of review, which places the burden of justifying

the hospitalization requirement on the State. The Court concludes that the requirements of § 188.025 are overbroad. The State did not prove that a D & E [dilatation and evacuation] abortion at 16–18 weeks gestation can reasonably be considered more dangerous when performed in a qualified free-standing outpatient facility rather than in a hospital. In fact, the evidence suggests that the prevailing medical practice is for such procedures to be performed outside the hospital setting.
662 F.Supp. at 419–20. *See also Planned Parenthood Ass'n v. Ashcroft*, 664 F.2d 687 (8th Cir. 1981), *aff'd in relevant part*, 462 U.S. 476, 482, 103 S.Ct. 2517, 2520, 76 L.Ed.2d 733 (1983) (invalidating Missouri's second-trimester (twelve week) hospitalization requirement).

fetus's gestational age, weight, and lung maturity. We therefore affirm the lower court's judgment that this portion of section 188.029 is unconstitutional.[5]

## C. When Human Life Begins

The first section of the bill that revised Missouri's abortion statute provides, in relevant part:

1. The general assembly of this state finds that:

(1) The life of each human being begins at conception;

(2) Unborn children have protectable interests in life, health, and well-being;

(3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.

2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term **"unborn children"** or **"unborn child"** shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development. § 1.205.

The district court held that the declarations that human life begins at conception and that unborn children have protectable interests in life, health, and well-being are unconstitutional because, as the Supreme Court has stated, "a State may not adopt one theory of when life begins to justify its regulation of abortions." *Akron*, 462 U.S. at 444, 103 S.Ct. at 2500 (citing *Roe v. Wade*, 410 U.S. 113, 159–62, 93 S.Ct. 705, 729–31, 35 L.Ed.2d 147 (1973)).

### 1. Standing

■ The state challenges the plaintiffs' standing to attack sections 1.205.1(1) and (2) on two grounds. The state first maintains that section 1.205 merely expands state tort, property, and criminal law protections for unborn children, while specifically excluding abortion from its coverage by providing in section 1.205.2 that section 1.205.1 should be interpreted consistently with the U.S. Constitution and Supreme Court decisions. Thus, the state argues, because section 1.205 does not involve abortion, no one in the plaintiff class has standing to challenge it. The state's second argument is that 1.205.1(1) and (2) have no substantive effect—they are merely statements of existing fact that cannot give rise to a cause of action in anyone. We disagree.

We first note that "the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases."

---

5. The state attempts to defend the statute by arguing that it "only requires that a physician perform *necessary* medical examinations so as to determine viability[;] * * * in other words those tests which are always performed by any prudent physician * * *." (emphasis added). The state's argument appears premised on an entirely different statute, however; the *Missouri* statute does not require doctors to make those tests necessary to determine viability. Rather, the statute plainly declares that in determining viability, doctors *must* perform tests to find gestational age, fetal weight and lung maturity. The district court found that this requirement, imposed at a point when the woman was believed to be 20 weeks pregnant, was not narrowly tailored to further either the state's interest in maternal health or its interest in the potential life of the fetus. 662 F.Supp. at 422. Tests to determine fetal weight, for instance, besides being unreliable and inaccurate, add $125 to $250 to the cost of abortions and generally are not medically appropriate until a point much later in pregnancy than required by section 188.029. *Id.* Similarly, performing amniocentesis, the only method available to determine lung maturity, is contrary to accepted medical practice until 28–30 weeks of gestation, expensive, and imposes significant health risks for both the pregnant woman and the fetus. *Id.* Given these findings, the district court correctly determined that the statute's requirements are unconstitutional.

*Margaret v. Edwards,* 794 F.2d 994, 997 (5th Cir.1986) (citing *Roe,* 410 U.S. at 123–29, 93 S.Ct. at 711–15; *Doe v. Bolton,* 410 U.S. 179, 187–89, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973)); *see also Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). Moreover, we are unpersuaded by the state's arguments against standing. Its first argument—that the statute at issue has nothing to do with abortion—is somewhat circuitous, requiring us fully to decide the merits before we can pass upon standing. Its second argument—that the statute at issue has no substantive effect—is belied by the state's vehement assertions to the contrary that the statute substantively affects tort, criminal, and property law.

> The plaintiff class alleged that
> Section 1.205.1(1) of the Act impermissibly attempts to establish that "[t]he life of each human being begins at conception," and § 1.205.1(2) of the Act impermissibly attempts to establish that ["u]nborn children have protectable interests in life, health, and well-being" as the underpinnings of the entire Act, contrary to [*City of Akron*] and contrary to the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution.

Complaint at ¶ 20. The plaintiffs thus alleged that Missouri was attempting to do exactly what the Supreme Court has declared it may not do: espouse a theory of when life begins as the foundation of the state's regulation of abortion. No persons are better situated to attack the constitutionality of this endeavor than those parties who are directly affected by the state's abortion laws—laws that allegedly are based on and reflective of an impermissible theory of life. The plaintiffs are such parties.[6] We

therefore reject the state's standing challenge.

## 2. Validity of Declaration

■ The state's arguments on the merits of sections 1.205.1(1) and (2) are similar to its standing arguments: (1) because the statute is "abortion-neutral," it is not inconsistent with *Roe;* and (2) the statute merely determines when life begins in a nonabortion context, a traditional state prerogative.[7]

We reject the assertion that Missouri's emphatic declaration of a state-sanctioned theory of life is "abortion-neutral." Sections 1.205.1(1) and (2) were contained in a bill that relates almost exclusively to abortion. As a "prefatory" statement, as so insistently urged by the state, the declaration of when life begins can only have been intended as an introductory and foundational comment. To adopt the state's contention that the statute is "abortion-neutral" is to overlook that every remaining section of the bill save one regulates the performance of abortions. The only plausible inference is that the state intended its abortion regulations to be understood against the backdrop of its theory of life. Rather than being abortion-neutral, the statute is simply an impermissible state adoption of a theory of when life begins to justify its abortion regulations.

The state contends that sections 1.205.-1(1) and (2) are saved by the pronouncement in section 1.205.2 that Missouri's laws are subject to the United States Constitution and to United States Supreme Court decisions. Hence, the state reasons, even though it has declared in an abortion bill that human life begins at conception, because that bill is subject to Supreme Court

---

**6.** As stated previously, the plaintiff class consists of health care professionals and facilities offering abortion counseling and services, and pregnant women seeking abortion services or pregnancy counseling. The status of the plaintiffs here is similar to the status of the plaintiffs in one of the Supreme Court's most recent abortion decisions. *See Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 752, 106 S.Ct. 2169, 2174, 90 L.Ed.2d 779 (1986) (plaintiffs included American College of Obstetricians and Gynecologists, certain

Pennsylvania-licensed physicians, and Pennsylvania abortion counselors and providers).

**7.** The state also argues "that it is established biological fact that the life of an individual human being * * * begins at conception. * * * The United States Supreme Court misspoke when it declared that the question of when life begins could not be resolved." (emphasis omitted). We see no point in addressing this contention.

decisions holding that states may *not* declare when life begins in the abortion context, section 1.205.1 must not have anything to do with abortion. The state concludes that its declaration is abortion-neutral and constitutional.

We reject this reasoning. A recitation that state laws must be compatible with the United States Constitution is simply a restatement of the postulate contained in article VI of the Constitution. Such a statement cannot, however, validate state laws that are in fact incompatible with the constitution. To accept the state's position would be to hold that every state law is valid as long as it contains a clause subjecting the law to the supremacy clause. We decline to so hold. We affirm the district court's judgment that sections 1.205.1(1) and (2) are invalid.[8]

### D. Public Funds, Employees, and Facilities

The final portions of the statute that the lower court declared unconstitutional prohibit the use of public funds, employees, and facilities for the purpose of "performing or assisting" an abortion or for "encouraging or counseling" a woman to have

an abortion not necessary to save her life.[9] We address separately the constitutionality of the "encourage or counsel" prohibitions and the "perform or assist" prohibitions.

### 1. "Encouraging or Counseling" Women to Have Abortions

The district court concluded that the ban on using public funds, facilities, or employees to "encourage or counsel" a woman to have an abortion is void for vagueness and violative of the right to privacy. We agree with these conclusions.

### a. Vagueness

■ In assessing a vagueness challenge, the court first determines whether the challenged enactment implicates constitutionally protected conduct. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191–92, 71 L.Ed.2d 362 (1982). If not, then the statute must be upheld unless it is impermissibly vague in all its applications. *Id.* at 497, 102 S.Ct. at 1192. If the statute does implicate constitutionally protected activity, the court must determine whether the statute is sufficiently precise to serve the goals of fair notice

---

**8.** We need not address the argument advanced by the plaintiffs that if in fact section 1.205.1(1) and (2) have nothing to do with abortion they must be invalidated because they violate the Missouri Constitution's requirement that "[n]o bill shall contain more than one subject * * *." Mo. Const. art. 3, § 23.

**9.** Specifically, the three sections provide:

**188.205. Use of public funds prohibited, when**

It shall be unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother, or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

**188.210. Public employees, activities prohibited, when**

It shall be unlawful for any public employee within the scope of his employment to perform or assist an abortion, not necessary to save the life of the mother. It shall be unlawful for a doctor, nurse or other health care personnel, a social worker, a counselor or persons of similar occupation who is a public employee within the scope of his public employment to encourage or counsel a

woman to have an abortion not necessary to save her life.

**188.215. Use of public facilities prohibited, when**

It shall be unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother or for the purpose of encouraging or counseling a woman to have an abortion not necessary to save her life.

The statute employs the following definitions:

**188.200. Definitions**

\* \* \* \* \* \*

(1) **"Public employee"**, any person employed by this state or any agency or political subdivision thereof;

(2) **"Public facility"**, any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivisions thereof;

(3) **"Public funds"**, any funds received or controlled by this state or any agency or political subdivision thereof, including, but not limited to, funds derived from federal, state or local taxes, gifts or grants from any source, public or private, federal grants or payments, or intergovernmental transfers.

and fair enforcement. *Id.* at 498, 102 S.Ct. at 1193. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499, 102 S.Ct. at 1193 (footnote omitted).

As a threshold matter, the state argues that the statutes at issue should not be strictly scrutinized because their penalties are civil, rather than criminal, and because the statutes do not implicate first amendment freedoms. We disagree. To the extent that a lesser standard of scrutiny is appropriate because of the civil nature of the penalty, a proportionately greater increase in scrutiny is warranted because of the threat that the statutes will inhibit the exercise of constitutional rights. The prohibition on "encouraging or counseling" implicates both first and fourteenth amendment rights of both physicians and their patients: the right to disseminate and receive information about abortion, and the right to knowingly and intelligently choose an abortion after consulting a physician. We therefore conclude that the "encouraging or counseling" ban must be scrutinized with particular care.

The statute prohibits two distinct activities: "encouraging" and "counseling." The state's proffered interpretation of these words, however, equates the two activities as encompassing and banning only "affirmative advocacy." Although such a construction may be *desirable,* "it is not within our power to construe and narrow state laws[,]" *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972), and the scope of the encouraging or counseling ban appears literally to be much broader than the interpretation offered by the state. We believe the interpretation offered by the state violates basic principles of statutory construction. *See Colautti,* 439 U.S. at 392, 99 S.Ct. at 684 (striking down a statute for vagueness, stating that the state's "argument that 'may be viable' is synonymous with 'viable' would make either the first or the second condition redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.").

More importantly, the statute is vague because the word "counsel" is fraught with ambiguity;[10] its range is incapable of objective measurement. *See Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). In such circumstances, the threat to the exercise of constitutionally protected rights is tangible; possible targets of the statute are chilled into avoiding even speech that is normally afforded the utmost protection under the Constitution.[11]

The state relies upon a Ninth Circuit case holding that Arizona's ban on state support

---

**10.** The state cites to *Black's Law Dictionary* to support its argument that "counseling" has a clearly delimited definition; the state refers, however, to one of only several alternative definitions. *See, e.g., Webster's Third New International Dictionary* 518 (1981):

> 1a: instruction or recommendation esp. when given as a result of consultation: opinion, advice, direction * * * b: a policy or plan of action or behavior * * * 2: interchange of opinion esp. on possible procedure: discussion, deliberation, consultation * * * 3 obs: faculty or exercise of deliberate judgment: prudence, thoughtfulness 4 archaic: a plan arrived at through deliberation * * * 5a archaic: secret purpose or opinion: private confidence: secret * * * b: reflection, thought, intent, or plan discreetly and carefully guarded from being known * * *[.]

**11.** Indeed, the district court cited evidence that the statute had already had this pernicious effect:

> There was evidence that all staff and resident physicians at Truman Medical Center were instructed by the Executive Director not to make "any ... comment relative to abortion" which is "not necessary to save the life of the mother." A memorandum by Department of Health Director, R. Harmon, M.D., revealed his belief that "[p]ublic facilities and employees under this bill will probably cease to mention abortion out of fear of prosecution." Dr. Debabrata Maulik also testified that the prohibition on "encouraging or counseling a woman to have an abortion" would leave a physician uncertain in distinguishing between lawful and unlawful discussions with patients. 662 F.Supp. at 425–26 (footnotes omitted).

for "counseling for abortion procedures" was not unconstitutionally vague. *Planned Parenthood v. State of Arizona*, 718 F.2d 938, 948–49 (9th Cir.1983). We find this case to be inapposite, however, because the Arizona Attorney General had previously given a narrowing construction to the phrase "abortion procedures" such that the ban on counseling for abortion procedures was significantly more precise than the ban at issue here. *Id.* Moreover, the wording of the Missouri statute is sufficiently different from that of the Arizona statute as to render them incapable of identical interpretations; "[b]ecause of the nature of the vagueness doctrine, any holding that a statute is unconstitutionally vague must necessarily be highly case-specific." *Margaret v. Edwards*, 794 F.2d 994, 999 n. 13 (5th Cir.1986).

We conclude that the district court was correct to hold that the "encouraging or counseling" portions of sections 188.-205, .210, and .215 are unconstitutionally vague.

### b. Right to Privacy

■ Alternatively, we agree with the district court—and other federal courts that have recently considered similar issues— that the ban on using public funds, employees, and facilities to encourage or counsel a woman to have an abortion is an unacceptable infringement of the woman's fourteenth amendment right to choose an abortion after receiving the medical information necessary to exercise the right knowingly and intelligently. *Cf. Commonwealth of Massachusetts v. Bowen*, 679 F.Supp. 137, 148 (D.Mass.1988) (permanently enjoining enforcement of regulations promulgated by Secretary of Health and Human Services that preclude federally funded projects from providing counseling or referrals for abortion); *Planned Parenthood Fed'n of Am. v. Bowen*, 680 F.Supp. 1465, 1473 (D.Colo.1988) (preliminarily enjoining same regulations on the ground that they violate,

*inter alia,* a woman's fifth amendment liberty interest in choosing whether to have an abortion).

The Supreme Court has consistently held that meaningful exercise of the right to choose abortion requires the state not to erect obstacles to patients' receipt of their physicians' medical judgment and assistance:

> The Court also has recognized, because abortion is a medical procedure, that the full vindication of the woman's fundamental right necessarily requires that her physician be given "the room he needs to make his best medical judgment." *Doe v. Bolton*, 410 U.S. 179, 192 [93 S.Ct. 739, 747, 35 L.Ed.2d 201] (1973). See *Whalen v. Roe*, 429 U.S. 589, 604–605, n. 33 [97 S.Ct. 869, 878–79 n. 33, 51 L.Ed.2d 64] (1977). The physician's exercise of this medical judgment encompasses both assisting the woman in the decision-making process and implementing her decision should she choose abortion. See *Colautti v. Franklin*, 439 U.S. 379, 387 [99 S.Ct. 675, 681, 58 L.Ed.2d 596] (1979). * * *
>
> * * * Until [the state's interest in maternal health becomes compelling] a pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and to effectuate that decision "free of interference by the State."

*Akron*, 462 U.S. at 427, 429–30, 103 S.Ct. at 2492 (quoting *Roe*, 410 U.S. at 163, 93 S.Ct. at 732) (footnotes omitted).

Missouri's statute, however, places the state between physicians and their patients by forbidding the physicians from relaying certain information, opinions, and advice. The statute contains no exception, for instance, to allow a doctor to advise a patient to have an abortion in those situations where the doctor deems abortion medically necessary although not necessary to save the patient's life.[12]

---

**12.** The district court pointed out that uncontradicted testimony demonstrated that "in such situations a physician has a professional duty to at least suggest or even urge the pregnant woman

to have an abortion." 662 F.Supp. at 427. The court noted:

> Dr. Maulik testified that the fear of civil liability and an ethical obligation would compel him to "strongly recommend," though nev-

Such an attempt to officially structure the dialogue between a woman and her doctor would require no discussion were it imposed on *all* doctors, because such attempts repeatedly have been held unconstitutional. *See, e.g., Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 759–65, 106 S.Ct. 2169, 2178–81, 90 L.Ed.2d 779 (1986). The state maintains that Missouri's statute is different, however, because it intrudes into the protected doctor-patient relationship only when the doctor is a public employee, is paid with public funds, or uses a public facility. Relying upon cases holding that states may refuse to subsidize abortions, the state contends that its ban on "encouraging or counseling" women to have abortions is simply a refusal to subsidize abortions, reflecting the state's policy preference for childbirth over abortion. *See, e.g., Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (Congress need not provide funds for indigent women to have medically necessary abortions despite its provision of funds for other medically necessary services); *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (states participating in Medicaid need not pay for nontherapeutic abortions for indigents simply because states pay childbirth expenses).

We think that the state's analogy of its ban on "encouraging or counseling" to bans on public abortion funding is completely inapt. Missouri is not simply declining to fund abortions when it forbids its doctors to encourage or counsel women to have abortions. Instead, it is erecting an obstacle in the path of women seeking full and uncensored medical advice about alternatives to childbirth. The state's limitation on doctor-patient discussions reflects the state's choice for childbirth over abortion in

a way that prevents the patient from making a fully informed and intelligent choice.

This state-created obstacle to exercise of the right to choose an abortion thus is far-removed from a state's refusal to remove obstacles not of its own creation. The Supreme Court has unequivocally stated that states cannot constitutionally impose such burdensome obstacles to what is at bottom a right *to decide* whether to terminate a pregnancy. *See Maher,* 432 U.S. at 473–74, 97 S.Ct. at 2382–83 (the right protected by *Roe v. Wade* is the right to make certain kinds of important decisions); *Harris,* 448 U.S. at 316, 100 S.Ct. at 2687 ("*government may not place obstacles in the path of a woman's exercise of her freedom of choice* ") (emphasis added). We can perceive of few obstacles more burdensome to the right to decide than a state-imposed blackout on the information necessary to make a decision. We therefore affirm the district court's judgment that the state's ban on "encouraging or counseling" is an unconstitutional infringement of the right to choose an abortion protected by the fourteenth amendment.

2. "Performing or Assisting" Abortions

The district court declared unconstitutional those portions of the statute prohibiting use of public employees, facilities, and funds, to "perform or assist" abortions. *See* §§ 188.205, .210, .215. With respect to the ban on using public facilities, the court based its holding on this court's decisions in *Nyberg v. City of Virginia,* 667 F.2d 754 (8th Cir.1982) (*Nyberg II* ), *appeal dismissed, cert. denied,* 462 U.S. 1125, 103 S.Ct. 3102, 77 L.Ed.2d 1358 (1983) and *Nyberg v. City of Virginia,* 495 F.2d 1342 (8th Cir.) (*Nyberg I* ), *appeal dismissed, cert. denied,* 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974). The district court also de-

---

er "force a decision" to have an abortion because of a woman's non-life-threatening health interests. A prohibition on this would be "devastating" to a medical practice. He further testified that it would be "dishonest" to merely discuss abortion as an option without a recommendation of "what in [his] judgment is the best possible course in terms of [the woman's] health and survival."

Dr. Carl Pearman also stated that he feels an ethical and professional obligation to give advice whether to choose abortion when requested by the patient to do so. If this were prohibited by law, Dr. Pearman stated that he would be forced to either violate the law or quit caring for patients who present with such health complications during pregnancy. *Id.* at 427 n. 53.

clared all three sections violative of the eighth amendment's ban on cruel and unusual punishment.

### a. Public Facilities

■ Section 188.215 makes it "unlawful for any public facility to be used for the purpose of performing or assisting an abortion not necessary to save the life of the mother * * *." The statute defines "public facility" to mean "any public institution, public facility, public equipment, or any physical asset owned, leased, or controlled by this state or any agency or political subdivision thereof." § 188.200(2).

The constitutional validity of this statute depends on whether this court's *Nyberg* cases control, or, rather, whether the Supreme Court's decision in *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), is more apposite. We agree with the district court and the plaintiffs that the *Nyberg* cases are controlling.

In *Nyberg II*, the city of Virginia adopted a resolution prohibiting doctors from using the facilities of the municipal hospital to perform any abortions other than those required to save the life of the mother. This court affirmed the district court's refusal to vacate an injunction barring implementation of the resolution. *Nyberg II*, 667 F.2d at 759. *Nyberg I* and *II* hold that states may not refuse to allow doctors to perform privately-paid abortions in public facilities. *Id.* at 758; *see also Planned Parenthood Ass'n v. Ashcroft*, 655 F.2d 848, 854–55 n. 9 (8th Cir.1981) (interpreting holding in *Nyberg I* ).

As we explained in *Nyberg II*, the abortion-funding cases the Supreme Court decided after *Nyberg I* did not require vacation of the injunction issued in *Nyberg I*. The Supreme Court cases, quite simply, held that the government need not provide public financing for elective abortions. *See Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980) (upholding statute prohibiting use of state funds for abortions); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (upholding constitutionality of the Hyde Amendment, which prohibited use of federal funds to reimburse women for the cost of abortions); *Poelker*, 432 U.S. at 521, 97 S.Ct. at 2392 (city not required to provide publicly financed hospital services for nontherapeutic abortions); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (state not required to provide funding for nontherapeutic abortions). The issue in those cases thus was different from the issue presented both here and in *Nyberg*. *See Nyberg II*, 667 F.2d at 758 ("There is a fundamental difference between providing direct funding to effect the abortion decision and allowing staff physicians to perform abortions at an existing publicly owned hospital.").

The suggestion by the state that *Nyberg II* misinterpreted *Poelker* is refuted by *Poelker* itself. The *Poelker* Court stated that *Poelker* and *Maher* turned on the same issue and that the analysis in *Maher* controlled the issue in *Poelker*. *Poelker*, 432 U.S. at 521, 97 S.Ct. at 2392 ("the constitutional question presented here is identical in principle with * * * the issue before us in *Maher v. Roe* "). The issue in *Maher* was whether a state constitutionally could refuse to provide Medicaid benefits for abortion while providing them for childbirth. Similarly, in *Poelker* the plaintiff was an indigent who sought a free abortion at the expense of the city.

The due process challenge that was made in *Nyberg* and that is made here raises a totally different issue: whether the state creates an undue burden or obstacle to the free exercise of the right to choose abortion when it bans access to public facilities. To prevent access to a public facility does more than demonstrate a political choice in favor of childbirth; it clearly narrows and in some cases forecloses the availability of abortion to women. As we explained in *Nyberg*, such a prohibition could prevent a woman's chosen doctor from performing an abortion because of his unprivileged status at other hospitals or because a private hospital adopted a similar anti-abortion stance. Such a rule could increase the cost of obtaining an abortion and delay the timing of it as well.

If *Poelker* will be extended to permit states to constitutionally prohibit all abortions at public facilities, it is far better that the Supreme Court, rather than this court, declare such a rule. Under the present status of the law we think it patently wrong to say that denial of the use of public facilities for abortion procedures does not violate the principles of *Roe v. Wade.*

Missouri's statute is indistinguishable from the resolution at issue in *Nyberg:* [13] it bars women seeking to obtain and pay for abortions access to public facilities when the evidence demonstrates that *no* public funds are expended by allowing the abortions.[14] As Judge Stephenson so concisely wrote in *Nyberg I:*

> The sweeping hospital resolution in question here cannot withstand the constitu-

tional parameters framed by *Doe* and *Roe.* It would be a nonsequitur to say that the abortion decision and its effectuation is an election to be made by the physician and his patient without interference by the state and then allow the state, through its public hospitals, to effectively bar the physician from using state facilities to perform the operation.

*Nyberg I,* 495 F.2d at 1346. We affirm the ruling that section 188.215 violates the fourteenth amendment.

### b. Public Employees

■ The state also challenges the trial court's ruling that section 188.210 is constitutionally infirm. Section 188.210 provides: "It shall be unlawful for any public employee within the scope of his employment

13. The state suggests that *Nyberg* is distinguishable because the public facility was the only hospital in the city of Virginia. The city's resolution therefore precluded any abortions from being performed in the city. This fact, however, was not particularly relevant—much less *essential*—to the holding in *Nyberg. Nyberg's* holding was based on the finding that the city was infringing the right to choose abortions that do not require expenditure of public funds, in a way that was not narrowly tailored to achieve any compelling state interest.

14. As the district court noted: "Mr. Richard Chern, Associate Administrator of Finance at Truman Medical Center [a public facility], testified that the full cost of abortions at TMC are recovered from the patient, without any sliding scale for indigency." 662 F.Supp. at 428 n. 55. Portions of Mr. Chern's testimony in response to questioning by plaintiffs' counsel were as follows:

> Overall we go through a process to determine or to approximate what the cost of the various services are and there are various methods that are used and it's primarily based off of medicare regulations which set down the various costs of the hospital or the entire facility and step it down into the various department and they give their allocation basis such as square footage, they're allocated to various areas for example as far as labor, fringe benefit costs based on the salaries and the hours of people, so there are various methods that are used to spread all the various costs back into the cost centers or the revenue producing areas. From there we obtain a general costs to charge ratio and in general that gives us an approximation of what the costs are for the various services. From there there are other factors which are

taken into consideration such as market conditions, what other similar hospitals in the area charge for a particular type of services and also as far as comparisons of charges per patient day overall, and per case, so that there are other comparisons made. From there there are determinations made as far as what the ultimate price will be.

> \* \* \* \* \* \*

> Q. Is there more attention paid to the pricing of abortion procedures than other procedures?
> A. There is a specific policy of the institution or the corporation in which it is to be insured that the cost is recovered from the people that are receiving those services so as a result there is more attention paid to those— the pricing of that particular service.
> Q. This policy which you have just described, am I correct that you're saying it's a policy directed solely toward abortion patients?
> A. Yes, toward the abortion services.
> Q. And that is to insure that the cost to the abortion patient makes it self-supporting, the procedure, is that the concept?
> A. Yes.

> \* \* \* \* \* \*

> Q. This policy of making the abortion patient pay the full cost of the service received, is there any distinction in that policy as applied to clinic patients of the hospital itself as opposed to private practice patients or physicians who bring their patients to Truman to do the procedure?
> A. There's no distinction made as far as the type of patient.
> Q. It's the same across the board?
> A. Yes.

Transcript at 3–4 to 3–6.

to perform or assist an abortion, not necessary to save the life of the mother."

Although we agree with the trial court that the statute is unconstitutional, our reasoning is different. The trial court held that the statute violates the eighth amendment. We do not reach the eighth amendment issue because we hold that this prohibition violates the due process clause as interpreted in *Roe* and its progeny.[15]

*Roe* and its progeny established that the due process clause protects women from unduly burdensome state interference with their right to decide whether to terminate pregnancies. *See, e.g., Roe*, 410 U.S. at 154–55, 93 S.Ct. at 727–28; *Maher*, 432 U.S. at 473–74, 97 S.Ct. at 2382–83. Although the due process clause "does not confer an entitlement to * * * *funds* [to pay for abortions]," *Harris*, 448 U.S. at 318, 100 S.Ct. at 2688 (emphasis added), it does preclude the states from "plac[ing] obstacles in the path of a woman's exercise of her freedom of choice * * *." *Id.* at 316, 100 S.Ct. at 2687. Just as a statutory prohibition on access to public facilities for privately-paid abortions constitutes such a government-created obstacle, so too does Missouri's ban on public employees performing or assisting abortions.

The evidence here showed that all of the public facility's costs in providing abortion services are recouped when the patient pays. Those costs must necessarily include the cost of employees' services. Hence, by refusing to permit public employees to perform or assist abortions, Missouri is not expressing its preference for childbirth over abortions by refusing to *fund* the latter. Rather, the state is declaring that even women who can afford abortions cannot obtain them through the assistance of public employees, for no other expressed reason than the state's desire to discourage abortions. This obstacle to exercise of the right to choose abortion cannot stand absent a compelling state interest; Missouri's desire to discourage abortions is not sufficient justification. We therefore affirm the judgment that Missouri's ban on performance or assistance of abortions by public employees is unconstitutional.

### c. Public Funds

The final provision at issue is section 188.205, which makes it "unlawful for any public funds to be expended for the purpose of performing or assisting an abortion, not necessary to save the life of the mother * * *." The trial court held that the prohibition on use of public funds to assist abortions constitutes cruel and unusual punishment under the eighth amendment because it precludes pregnant prison inmates from obtaining abortions. 662 F.Supp. at 429. Prison inmates seeking abortions receive assistance from state employees in the form of escorts and, often, transportation to outside facilities. Because the accompanying expenditure of public funds is barred by the statute, inmates are effectively prevented from obtaining abortions. The district court held that this violates the eighth amendment because it constitutes deliberate indifference to prisoners' medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

The state raises a number of challenges to this ruling,[16] but primarily maintains

---

**15.** We also need not decide the issue whether section 188.215 violates the eighth amendment, as the trial court held.

Although plaintiffs did not challenge this specific provision under the due process clause, our ruling as to the provision concerning public facilities requires a similar holding as to the provision concerning public employees. It would be totally incongruous to hold that the state cannot deny use of public facilities for paid abortions but may forbid public employees from assisting in those surgical procedures.

**16.** The state argues that no plaintiff has standing to raise this claim because none of the named plaintiffs is an inmate and third-party standing is not warranted. The state does not claim, however, that it was error to allow the named plaintiffs to represent a class of pregnant females seeking abortion services or counseling. That class includes pregnant female prison inmates. In addition, the evidence showed that plaintiff Reproductive Health Services has performed abortions on prisoners from state institutions. 662 F.Supp. at 428. In circumstances such as those present here, clinics and physicians have standing to raise the rights of their patients. *See Singleton v. Wulff*, 428 U.S. 106, 118, 96 S.Ct. 2868, 2876, 49 L.Ed.2d 826 (1976) (plurality opinion) and *id.* at 128 (concurring

that "assistance" within the meaning of the statute does not encompass the type of assistance given by state employees to inmates when they obtain abortions. Thus, the state contends, the statute does not preclude state employees from transporting and escorting inmates to obtain abortions. The state further argues that it was erroneous for the district court to declare the "assist" portion *facially* unconstitutional simply because the court "could hypothesize an offbeat interpretation of the statute which under certain very unique circumstances could be applied to a person, a female inmate, so as to violate her rights." Because we agree with the state that the district court erroneously construed the term "assist," we need not address its second contention.

We cannot accept the conclusion that "assisting" an abortion encompasses driving or escorting the patient to the location where the procedure is to take place. The abortion itself does not take place in the vehicle or as the patient is being escorted. We think a more reasonable interpretation of the phrase "assisting an abortion" is the one suggested by the state: direct participation in the surgical procedure itself. Because we thus hold that the statute does not prevent state employees from arranging for abortion procedures for inmates or from transporting and escorting inmates to abortion facilities, we must reverse the district court's judgment that section 188.205

violates the eighth amendment.[17] Moreover, because the Supreme Court has made clear that neither the due process clause nor the equal protection clause requires public funding for abortions, we conclude that Missouri's ban on the expenditure of public funds for the purpose of performing or assisting abortions is constitutional.[18]

### E. Attorneys' Fees

The state also appeals from the district court's award of attorneys' fees to the plaintiffs, arguing that: (1) the rates awarded to most of the attorneys were unreasonable; and (2) the district court should have reduced the number of hours on which it based the award due to duplication of effort and an unreasonably high number of hours devoted to this action. The district court carefully considered both the rate and the number of hours expended and correctly applied the relevant legal criteria. Finding no abuse of discretion, we affirm the award of attorneys' fees and award plaintiffs full costs on appeal.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I join Parts A and B of the Court's opinion, holding invalid Mo.Ann.Stat. §§ 188.025 (hospitalization requirement) and 188.029 (tests to determine viability). I also join Part D(2)(c), upholding § 188.205, the ban on expenditure of public funds for

and dissenting opinion of Powell, J., joined by three Justices) (agreeing that in the event of direct state interference with the physician-patient relationship, "one party to the relationship should be permitted to assert the constitutional rights of the other").

The state further suggests that the eighth amendment issue was not properly raised below because not pled in the complaint. Nevertheless, evidence was presented without objection at trial about the fact and the manner of inmates' receipt of abortion services at Reproductive Health Services. We deem the issue tried by implied consent of the parties. *See* Fed.R. Civ.P. 15(b).

**17.** Because we resolve this issue on statutory grounds, we need not and do not decide the constitutional question resolved by the district court. We note, moreover, that this case does not present the question recently decided in the

affirmative by the Third Circuit: whether the eighth amendment requires the government to assume the cost of providing inmates with elective abortions in the absence of alternative methods of financing. *See Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir.1987), *cert. denied,* ―― U.S. ――, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *see generally* Note, *Inmate Abortions—The Right to Government Funding Behind the Prison Gates,* 48 Fordham L.Rev. 550 (1980).

**18.** The plaintiffs argue here, as they did below, that sections 188.205, .210, and .215 violate "academic freedom" because they would remove clinical instruction in abortion procedures from the curricula of state medical schools. None of the named or class plaintiffs is alleged to be a medical student, however, and we hold that plaintiffs do not have standing to raise this claim.

abortions not necessary to save the life of the mother.

As to Part D(1), invalidating those portions of §§ 188.205, 188.210, and 188.215 forbidding the use of public facilities, employees, or funds to encourage or counsel certain abortions, I concur in the result. These statutes sharply discriminate between kinds of speech on the basis of their viewpoint: a physician, for example, could discourage an abortion, or counsel against it, while in a public facility, but he or she could not encourage or counsel in favor of it. That kind of distinction is flatly inconsistent with the First Amendment, as incorporated against the states by the Due Process Clause of the Fourteenth Amendment.

As to Parts D(2)(a) and (b), I also concur in the result. I am unable to distinguish this case from *Nyberg v. City of Virginia,* 667 F.2d 754 (8th Cir.1982), *appeal dismissed and cert. denied,* 462 U.S. 1125, 103 S.Ct. 3102, 77 L.Ed.2d 1358 (1983). This panel is bound by *Nyberg.*

As to Part C, I respectfully dissent in part. Of course a governmental declaration about when human life begins, insofar as it is used to justify regulation of abortion, is unconstitutional. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). But I do not see why Mo.Ann.Stat. § 1.205 should not be upheld insofar as it relates to subjects other than abortion. The statute, for example, may mean that the negligent killing of a fetus gives rise to a state-law tort action for wrongful death. Neither the District Court nor this Court suggests that such a change in the common law, if limited to non-abortion situations, would violate the federal Constitution. Just such a purpose was apparently part of what the State Legislature had in mind when it passed this law. Section 1.205.4, which the Court does not quote, reads as follows:

> Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

The implication is that the section may properly be interpreted as creating causes of action against persons other than the mother. The statute also, the State argues, relates to the property rights of the unborn, and to the protection extended to them by the criminal law. Again, legislation on these subjects, wise or unwise, is within the purview of state legislatures, absent some constitutional obstacle, and none is suggested.

In short, I would not hold §§ 1.205.1(1) and (2) facially invalid, but only invalid as applied to the subject of abortion.

As to Part E of the Court's opinion (relating to attorneys' fees), I concur.